**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Oscar de J. TOBON–BUILES,
Defendant-Appellant.**

**No. 82–5490.**

United States Court of Appeals,
Eleventh Circuit.

June 6, 1983.

Rehearing En Banc Denied Sept. 13, 1983.

Lawrence J. Arnkoff, Coral Gables, Fla., for defendant-appellant.

Michael T. Simpson, Asst. U.S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before RONEY and CLARK, Circuit Judges, and GIBSON *, Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge:

Oscar de J. Tobon-Builes was convicted by a jury on a one-count indictment charging Tobon with using a trick, scheme, or device to conceal and coverup and to cause to be concealed and covered up material facts in a matter within the jurisdiction of the Department of Treasury of the United States, in violation of 18 U.S.C. § 1001 (1976). The indictment specifically alleged that Tobon concealed and caused to be concealed the existence, source, and transfer of approximately $185,200 in cash by purchasing approximately twenty-one cashier's checks in amounts less than $10,000 from eleven different financial institutions, using a variety of names, including false names, as payees and remitters for the purpose of avoiding the financial institutions' filing of

Currency Transaction Reports ("CTRs") required by 31 U.S.C. § 1081 (1976) and 31 C.F.R. § 103.22 (1982). In this appeal, Tobon contends that: (1) he did not commit the offense of concealment under § 1001 because he was under no legal duty to disclose the existence, source, and transfer of the $185,200; (2) the trial court erred in denying his motion to suppress evidence and statements derived from an alleged illegal arrest; (3) the trial court erred in admitting a gun seized at the time of Tobon's arrest and thereby denied Tobon his right to a fair trial; (4) the prosecutor's closing remark that defense counsel could not logically explain the evidence constituted an improper comment on Tobon's failure to testify. For the reasons set forth herein we reject all of Tobon's contentions and affirm his conviction.

### I. Factual Background

The undisputed evidence presented at trial indicated that over a six-hour period Tobon and his female companion, Theresa Roman, went to ten banks in Northern Florida and at each bank made virtually simultaneous pairs of cash purchases of cashier's checks, each pair totaling around $18,000, yet each individual check for less than $10,000, thereby escaping the bank's required filing of a Currency Transaction Report for cash transactions exceeding $10,000. 31 C.F.R. 103.22(a). The couple used a variety of false names in identifying themselves to the banks and attempted to conceal the fact that they were together by entering the banks separately and going to different tellers. Testimony of these banking transactions was provided by bank tellers who sold the cashier's checks to Tobon and Roman. Testimony regarding the events leading up to the couple's arrest was provided by surveillance police officers who observed the couple's activities during their cashier-check purchasing spree. This testimony revealed the following scenario.

On December 30, 1981, Tallahassee police officers observed Tobon and Roman each purchasing $9,000 in cashier's checks from separate tellers at the Barnett Bank in

* Honorable Floyd R. Gibson, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

downtown Tallahassee. Tobon and Roman were Hispanic and had difficulty communicating with the tellers in English. The couple left the bank in the same car, a 1979 Cadillac. Investigator Slovenkay was notified of this suspicious banking transaction and established a surveillance of the couple at about 1:00 p.m. The surveillance team later observed the couple repeating the same transaction at the Florida Federal Savings and Loan Association, each again purchasing $9,000 cashier's checks with cash. Tobon and Roman then drove to the Sun Federal Savings and Loan Association and unsuccessfully attempted to repeat the transaction. They next drove to the Tallahassee Federal Savings and Loan Association where Roman paid cash for another $9,000 cashier's check and Tobon unsuccessfully attempted to purchase $9,000 in traveler's checks. They then went to a K-Mart store where Tobon spent half an hour consulting the yellow pages under the listing of financial institutions. Thereafter, each purchased $9,000 cashier's checks at two more Tallahassee banks, the Ellis National Bank and the Florida State Bank, and then returned to the Barnett Bank, where Roman changed coats and attempted to purchase yet another $9,000 cashier's check. When bank officials, following a police request, asked for identification, Roman said she would have to retrieve it from her car. Roman went back to the Cadillac where Tobon was waiting and the two drove away. The couple went to a local restaurant to eat dinner. After dinner, approximately 6:30 p.m., they drove north through Tallahassee, stopped for fuel and asked directions to Pensacola, Florida, via Interstate 10. They then drove north on Highway 27 continuing some twenty miles north of the well-marked I–10 cutoff until they were within a mile of the Georgia state line. They again stopped and requested directions to I–10, then returned south on Highway 27 and eventually turned west onto I–10.

By the time Tobon and Roman entered I–10, the surveillance team knew that the two had purchased between nine and eleven cashier's checks for $9,000 each using a variety of different Hispanic names as payees. Investigator Slovenkay had been advised by banking and customs officials that banks were required to file reports for currency transactions of $10,000 or more. Slovenkay concluded that Tobon and Roman were involved in a scheme to circumvent those reporting requirements. Slovenkay also believed that the cashier's check purchases were related to illegal drug trafficking and efforts to launder drug money. The surveillance team, which at this point consisted of twelve officers, stopped the Cadillac on a bridge approximately one mile after it had turned west on I–10. Slovenkay and one other officer had their weapons drawn. Tobon exited the car and was patted down. Tobon produced a Columbian driver's license but did not have his passport on him. The vice squad's Spanish speaking secretary, Leslie Ave, attempted to advise the couple of their rights, but could not communicate with either of them. At this point, it was 8:00 p.m., dark, cold, windy, rainy, and traffic on the interstate was heavy. Slovenkay therefore decided to transport Tobon and Roman back to the police station.

At the station, Ave gave Tobon and Roman full *Miranda* warnings in Spanish. Both said they fully understood their rights. Later, Customs Patrol Officer David Cota, who was bilingual, gave Tobon the *Miranda* warnings. Tobon waived his rights and stated that he had won a lot of money gambling but that it was not in the Cadillac. Cota also advised Roman of her *Miranda* rights. Roman understood and waived those rights. She claimed ownership of the Cadillac and consented to a search of it. Shortly later, Tallahassee Officer Donna Campbell, who was bilingual, again advised Tobon of *Miranda* rights. Tobon said he understood his rights and signed a written waiver of such rights. The waiver was written in Spanish. Tobon was relaxed, cooperative, and spoke freely and openly. He told Officer Campbell that he won over $100,000 playing poker and was purchasing cashier's checks in amounts less than $10,000 to avoid bank reporting requirements because he did not want to pay

federal taxes on his winnings. Campbell then interviewed Roman after she had executed a written waiver of her *Miranda* rights in Spanish. Roman again claimed ownership and consented to search of the Cadillac. Campbell then returned to Tobon who granted permission to look through luggage and property of his in the Cadillac. The search of the car revealed the following items: eleven $9,000 cashier's checks purchased in Tallahassee on December 30, 1981, with numerous different Hispanic names, including Roman but not Tobon as remitters and payees; torn customer receipt copies of ten cashier's checks purchased December 29, 1981, in Orlando, seven for $9,000, two for $9,100, and one for $5,000; $12,000 in U.S. currency; the return portion of a round-trip airline ticket from Medellin, Columbia—Miami, Florida; and a loaded .38 revolver. All of these items were introduced into evidence over Tobon's objections. Tobon sought to suppress all evidence and statements derived from the allegedly illegal warrantless arrest. The court found that the police officers, specifically Investigator Slovenkay, had probable cause to believe Tobon violated currency laws; "exigent circumstances" justified the warrantless arrest because the police officers reasonably believed the automobile contained evidence that could be easily destroyed or concealed. The court also found that Tobon voluntarily consented to the search of the car. Finally, Tobon's statements were voluntarily given after Tobon knowingly and intelligently waived his right to counsel and to remain silent.

## II. *18 U.S.C. § 1001: Concealment*

The indictment charged Tobon with violating § 1001 by knowingly and willfully concealing and causing to be concealed, by trick, scheme, or device, material facts within the jurisdiction of the Department of Treasury of the United States. The material facts concealed were the existence, origin, and transfer of approximately $185,200 in cash. Tobon, by his own admission, sought to prevent banks from filing Currency Transaction Reports by structuring his cash purchases of $185,200 in cashier's checks as a number of smaller cash purchas-

es, each being less than $10,000. Tobon's purpose for doing this was to prevent the Internal Revenue Service from learning about the large sum of cash he purportedly won gambling. Tobon's main contention on this appeal is that he could not have violated the concealment prohibition of § 1001 because he was under no legal duty to report any of his cash transactions. Tobon points out that, under 31 U.S.C. § 1081 and 31 C.F.R. § 103.22, the legal duty to file Currency Transaction Reports for transactions exceeding $10,000 applies only to the financial institutions from which he purchased the cashier's checks.

Section 1001 of Title 18 U.S.C., provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, *conceals or covers up by any trick, scheme, or device, a material fact,* or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. (Emphasis added.)

This section is designed "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Gilliland,* 312 U.S. 86, 92–93, 61 S.Ct. 518, 521–522, 85 L.Ed. 598 (1941). It is well established that this section encompasses two distinct offenses, false representation and concealment of a material fact. *United States v. Diogo,* 320 F.2d 898, 902 (2d Cir.1963). False representations under § 1001 require proof that the defendant knowingly made a false or fraudulent statement; "concealment requires proof of willful nondisclosure by means of a trick, scheme, or device." *Id.* at 902. Generally, concealment violations under § 1001 relate to the nondisclosure of statements required by statute, government regulation or form. *See United States v.*

*Irwin,* 654 F.2d 671, 678–79 (10th Cir.1981); *also see* Goldstein, *Conspiracy to Defraud the United States,* 69 Yale L.J. 405, 454 (1959). The *Irwin* case is illustrative of the distinction between false statement and concealment under § 1001. There, the defendant, a grant expediter aided a city in obtaining Economic Development Administration grant funds to finance an industrial park project. In the grant application, Irwin stated that he had not and would not be compensated for his assistance in obtaining the grant, even though he already had received compensation for grant services from the city and was to receive additional compensation from Adams, the eventual industrial park project engineer. This supported a false statement charge under 18 U.S.C. § 1001. *Id.,* 674–76. After the EDA approved the grant, Adams agreed to pay Irwin $18,000 out of grant funds for services which Irwin knew were ineligible for payment under the EDA grant. Nevertheless, Irwin, in his newly assumed capacity as city manager, approved and submitted to the EDA for reimbursement the three bills from Adams; each bill included charges for the ineligible services performed by Irwin but those charges were not indicated on the face of the bills. Irwin's submission of these bills supported three false claim charges under 18 U.S.C. § 287. *Id.,* 675, 680–83. However, the court held that these submissions would not support a concealment charge under § 1001 because no one had any legal duty to disclose the charges for ineligible payments. The court emphasized that the government completely failed to show any statute, EDA regulation, or form requiring disclosure of the facts the defendant was convicted of concealing. *Id.* at 678.

In contrast to *Irwin,* however, in the case before us there are statutory and regulatory provisions requiring the disclosure of Tobon's currency transactions. Section 1081 of Title 31 of the United States Code, provides:

> Transactions involving any domestic financial institution shall be reported to the Secretary at such time, in such manner, and in such detail as the Secretary may require if they involve the payment, receipt, or transfer of United States currency, or such other monetary instruments as the Secretary may specify, in such amounts, denominations, or both, or under such circumstances, as the Secretary shall by regulation prescribe.

The purpose of this section was to aid the government in criminal tax and regulatory investigations. *California Bankers Association v. Shultz,* 416 U.S. 21, 37–38, 94 S.Ct. 1494, 1505–1506, 39 L.Ed.2d 812 (1974). *See* 1970 U.S.Code Cong. & Ad.News, 4394–4396. By its terms § 1081 does not explicitly require Tobon to report any transaction in currency. Although the Secretary of Treasury is clearly authorized under 31 U.S.C. § 1082 [1] to require both private individuals and financial institutions to file currency reports, the Secretary has, pursuant to 31 C.F.R. § 103.22(a),[2] required only that financial institutions file currency reports when they participate in "a transaction in currency of more than $10,000." "A transaction in currency" is defined, under 31 C.F.R. § 103.11, as "[a] transaction involving the physical transfer of currency from one person to another," and *"person"* is defined to include an individual, partnership, association, and joint venture. Final-

---

1. 31 U.S.C. § 1082, provides:
 The report of any transaction required to be reported under this subchapter shall be signed or otherwise made both by the domestic financial institution involved *and by one or more of the parties thereto or participants therein, as the Secretary may require.* If any party to or participant in the transaction is not an individual acting only for himself, the report shall identify the person or persons on whose behalf the transaction is entered into, and shall be made by the individuals acting as agents or bailees with respect thereto. (Emphasis added.)

2. 31 C.F.R. § 103.22(a) reads:
 Each financial institutional shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000. Such reports shall be made on forms prescribed by the Secretary and all information called for in the forms shall be furnished.

ly, the Secretary has prescribed Form 4789, (Dept. of Treasury 1980) which states: "[m]ultiple transactions by or for any person which in any one day total more than $10,000 should be treated as a single transaction, if the financial institution is aware of them."

Considering the foregoing statutes, regulations, and form, we believe that Tobon was involved in at least ten separate "transactions in currency of more than $10,000," which were clearly within the ambit of the financial institution reporting requirements of 31 U.S.C. § 1081 and 31 C.F.R. § 103.22. The undisputed evidence showed that Tobon and Roman, acting on Tobon's behalf, went to ten different financial institutions and made virtually simultaneous pairs of cash purchases of cashier's checks, each pair totaling around $18,000. It is clear that Tobon and Roman acted as a "person" under the broad definition in 31 C.F.R. § 103.11, whether as a principal/agent, an association, or a joint venture. According to Tobon, all of the money involved in the transactions was his money from poker winnings, while Roman simply helped make purchases for him. Each pair of purchases happened at the same financial institution on the same day. And, by Tobon's own admission, his use of false names and his structuring of single $18,000 transactions as two sets of $9,000 cash transfers represented nothing more than a scheme to prevent the financial institutions from fulfilling their legal duty to file reports for these transactions.

In *United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979) that court adopted a sensible, substance-over-form approach in dealing with schemes to circumvent financial institution reporting requirements. In *Thompson,* the defendant, a chairman of the Board of a bank, was convicted of violating § 1081 by causing his bank to fail to file a Currency Transaction Report on a $45,000 loan to a customer, Welch, to finance drug transactions. The defendant structured the loan as five separate $9,000 loans. On appeal the court rejected the defendant's claim that he could intentionally structure a single transaction in currency

as multiple smaller transactions to avoid the reporting requirements of § 1081 and 31 C.F.R. § 103.22. The court reasoned:

> Appellant analogizes this to a taxpayer structuring a financial transaction in a certain manner to avoid, rather than evade, the payment of taxes. The analogy is inapposite. Congress has lawfully required reporting of transactions in currency of more than $10,000 as an aid to criminal, tax, or regulatory investigations or proceedings. In the instant case, appellant *intentionally sought to defeat the statutory requirements by engaging in an unreported transaction in currency of more than $10,000.* Appellant cannot flout the requirements of § 1081 with impunity. The decision to structure a $45,000 transaction in currency as five $9,000 loans with the intent to annul the reporting requirements does not equate to a decision to structure a financial transaction in a lawful manner so as to minimize or avoid the applicability of a tax covering only specific activity.

*Id.,* 1203–04. (Emphasis added.) *See also United States v. Hajecate,* 683 F.2d 894, 896–97 (5th Cir.1982) (Acts which are themselves legal lose their legal character when they become elements of an unlawful scheme.)

Tobon claims, however, that *Thompson* is inapposite because the defendant there was a bank official who had a legal duty to disclose a currency transaction exceeding $10,000. Tobon suggests the case before us is closer to the *Irwin* case in that Tobon had no personal legal duty under any statute or regulation requiring him to disclose any transaction exceeding $10,000. Although the *Thompson* court does not indicate whether the bank official had a legal duty to file a currency report on his transaction, it does state that the responsibility for filing the report lay upon the teller who disbursed the $45,000. *Thompson,* 603 F.2d at 1202. More important, however, the *Thompson* court made clear that the defendant's liability, like Tobon's liability here, stemmed not from his duty to file a currency report but rather from his causing

the financial institutions to fail to file the required report. *Id.* at 1201.

■ Furthermore, the requirement that a defendant must have a legal duty to disclose before he can be convicted of concealment under § 1001 has no application where, as here, the government charged and proved that Tobon willfully and knowingly caused financial institutions not to report currency transactions that they had a duty to report and would have reported if they had known about such transactions. Support for this holding is found in 18 U.S.C. § 2(b) which provides that one who "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." Section 2(b), a definitional provision, is directly applicable to convictions under § 1001. *See* Revisor's note to 18 U.S.C.A. § 1001 ("[r]eference to persons causing or procuring was omitted [from § 1001] as unnecessary in view of definition of 'principal' in Section 2 of this title.")[3] *Also see Pereira v. United States,* 202 F.2d at 836–37 (5th Cir.), *aff'd.,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954). In *United States v. McClanahan,* 230 F.2d 919 (5th Cir.1956), *cert. denied* 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47 (1956), the court applied § 2(b) to the concealment provision of § 1001. In that case the defendant was charged under § 1001 and § 2 with willfully and knowingly causing, by scheme, trick, and device, veterans to conceal the fact that they did not intend to occupy premises to be purchased. The defendant's scheme involved using veterans as straw purchasers of dwellings in order to obtain low-interest Veterans Administration mortgage loans. The defendant caused the veterans to falsely affide to the Veterans Administration that they would occupy the dwellings as homes. Despite the fact that only the veterans had the duty to provide truthful information concerning occupying the homes, McClanahan's conviction for causing the concealment was upheld. *Id.,* 922–23.

■ The instant case is admittedly distinguishable from the *McClanahan* case in one respect. Unlike in *McClanahan,* here those who had a legal duty to disclose—the financial institutions—were wholly innocent, having no knowledge of Tobon's scheme to circumvent reporting requirements. This distinction, however, is not controlling because it is well established that § 2(b) was designed to impose criminal liability on one who causes an intermediary to commit a criminal act, even though the intermediary who performed the act has no criminal intent and hence is innocent of the substantive crime charged, in this case concealment. *See United States v. Pereira,* 202 F.2d at 836–37. (Court applies § 2(b) in finding defendant liable as principal under § 18 U.S.C. 2314 for willfully causing innocent bank clerk to mail into interstate commerce a fraudulently obtained check.) *Also see United States v. Ruffin,* 613 F.2d 408, 412 (2d Cir.1979) ("It is ... clear that under 18 U.S.C. § 2(b) one who causes another to commit a criminal act may be found guilty as a principal even though the agent who committed the act is innocent or acquitted."); *United States v. Catena,* 500 F.2d 1319, 1323 (3d Cir.1974) (under § 2(b), a person may be guilty of causing a false claim to be presented to the United States even though he uses an innocent intermediary, *e.g.,* insurance carriers, to actually pass on the claims to the United States); *United States v. Lester,* 363 F.2d 68, 72–73 (6th Cir.1966), *cert. denied* 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967); *United States v. Inciso,* 292 F.2d 374, 378 (7th Cir. 1961).

The legislative history behind § 2(b) supports this interpretation. As recognized in *Pereira,* 202 F.2d 837, the revisor's note to § 2 of Title 18, as enacted in 1948, indicates that § 2(b) was intended to remove all doubt that one who "causes the commission of an indispensable element of the offense by an innocent agent or instrumentality, is

---

**3.** Accordingly, an indictment need not specifically cite to § 2 for the government to proceed

on this theory of liability. *United States v. Catena,* 500 F.2d 1319, 1323 (3d Cir.1974).

guilty as a principal." [4] The same revisor's note also states that § 2(b) was designed to accord with such decisions as *United States v. Giles,* 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493 (1937). In *Giles* the Supreme Court affirmed the conviction of a bank teller for violating a statute prohibiting a national bank employee from making intentionally false entries in its books. The court held that although the bank teller had not personally made any false entries he could nevertheless be found guilty on the basis of evidence that he caused such entries to be made by innocent intermediaries. *Id.,* 300 U.S. 48–49, 57 S.Ct. 344. In view of language and legislative history of § 2(b), we have little doubt that Tobon is liable under § 1001 for causing the financial institutions not to file the required currency reports even though the financial institutions had no criminal intent and thus were innocent of any concealment under § 1001.

 Also, because of the operation of § 2(b), Tobon's legal incapacity to commit the crime of concealment by himself, owing to his lack of any duty to report currency transactions exceeding $10,000, does not detract from his liability under § 1001 for willfully causing the innocent but duty-bound financial institutions not to disclose such transactions. Other Courts have interpreted § 2(b) to find that a person, like Tobon, who is incapable of committing a substantive criminal offense if he acted alone may nevertheless be liable as a principal where he willfully causes the prohibited conduct (*e.g.,* nondisclosure of a currency transaction exceeding $10,000) to be committed by intermediaries (*e.g.,* the financial institutions) who have the capacity to commit the substantive criminal offense but who lack the criminal intent to be guilty of that offense. *See United States v. Ruffin,* 613 F.2d at 412 (Defendant, although legally incapable of personally committing offense of fraudulently obtaining Economic Development Act funds (42 U.S.C. § 2730), nevertheless liable as the principal where he willfully caused innocent agent meeting ca-

pacity requirement to engage in proscribed conduct. (§ 2(b)). *United States v. Lester,* 363 F.2d 68, 72–73 (Under § 2(b) defendants liable for conspiring to willfully cause police officers to act "under color of state law" to deprive third party of civil rights (18 U.S.C. § 242) even though police officers were found innocent of any wrongdoing and defendants lacked legal capacity to act "under color of state law."); *United States v. Wiseman,* 445 F.2d 792, 794–95 (2d Cir.1971) (Under § 2(b) defendants, private process servers, liable for violating civil right under color of state law (18 U.S.C. § 242) by willfully causing a civil court clerk, a state employee, to enter judgment against a third person, where the clerk was unaware that defendants had fraudulently procured such judgments, and where defendants lacked capacity to act under color of state law.)

 The legislative history and purpose behind § 2(b) supports this interpretation. Prior to 1951, 18 U.S.C. § 2(b), provided: "Whoever willfully causes an act to be done which if directly performed by him would be an offense against the United States is also a principal and punishable as such." However, in 1951, § 2(b) was amended to read: "Whoever willfully causes an act to be done which if directly performed by him *or another* would be an offense against the United States, is punishable as the principal." The Congressional purpose in adding the words "or another" was "to ... make certain the intent to punish [persons embraced within § 2] ..., regardless of the fact that they may be incapable of committing the specific violation." 1951 U.S.Code Cong. & Ad.News, pp. 2578, 2583. *Also see Lester* at 73. We agree with the Court in *Ruffin,* 613 F.2d at 413, that Congress amended 18 U.S.C. § 2(b) "to enlarge the scope of criminal liability under existing substantive criminal laws so that a person who operates from behind the scenes may be convicted even though he is not expressly prohibited by the substantive statute from engaging in the

---

4. In *United States v. Ruffin,* 613 F.2d 408, 413–14, the court quoted identical language from a

1948 House Report explaining the purpose of § 2(b).

acts made criminal by Congress." By adding the words "or another," Congress sought to extend criminal liability to defendants, like Tobon, who cause an intermediary to commit criminal acts where the intermediary, though innocent of the substantive offense, has the capacity to commit that offense and the causer lacks such capacity. *See Wiseman,* 455 F.2d at 794–95. As Judge Mansfield succinctly expressed in *Ruffin,* 613 F.2d at 416: "In causing an innocent intermediary to commit a criminal act, the causer adopts not only the intermediary's act but [also] his capacity [to commit the crime]."

Finally, we can discern no sound policy reason why Tobon should escape criminal liability for causing concealment here either because he lacked a personal duty to report or because the financial institutions he caused to fail to report did not have the sufficient criminal intent to conceal and thus were innocent of concealment under § 1001. A cogent analysis of the rudimentary principals of criminal law underlying our application of § 2(b) here was provided in *United States v. Lester,* 363 F.2d at 73:

It is but to quote the hornbook to say that in every crime there must exist a union or joint operation of act, or failure to act, and intent. However, this is far from suggesting that the essential element of criminal intent must always reside in the person who does the forbidden act. Indeed, the latter may act without any criminal intent whatever, while the *mens rea*—"willfulness"—may reside in a person wholly incapable of committing the forbidden act. When such is the case, as at bar, the "joint operation of act and intent" prerequisite to commission of the crime is provided by the person who willfully causes the innocent actor to commit the illegal act. · And in such a case, of course, only the person who willfully causes the forbidden act to be done is guilty of the crime.

In the instant case, Tobon's willfullness was clearly established by evidence showing he knew about the currency reporting requirements and that he purposely sought to prevent the financial institutions from filing required reports by using false names and by structuring his transactions as multiple smaller transactions under $10,000. Moreover, because of Tobon's deceptive transactions, the financial institutions, *i.e.,* the innocent intermediaries, were duped into not reporting currency transactions they would have had a duty to report and indeed would have reported had they known about Tobon's scheme. Thus, by operation of § 2(b), Tobon's criminal intent to cause a concealment is joined together with his innocent intermediaries' duties to report (*i.e.,* their capacity to commit the crime of concealment) and their failure to report (*i.e.,* "the forbidden act") to constitute the elements of actionable concealment under § 1001. *See Ruffin,* 613 F.2d at 415.

We conclude by emphasizing that the application of § 2(b) to uphold Tobon's conviction for concealment is wholly consistent with the purposes of § 1001. As mentioned above, § 1001 was intended to cover deceptive practices aimed at frustrating or impeding the legitimate functions of government departments or agencies. *See United States v. Gilliland,* 312 U.S. at 93, 61 S.Ct. at 522 (1941). To permit Tobon to escape liability under § 1001 here would amount to condoning deceptive schemes designed to deprive the Department of Treasury of valuable information contained in Currency Transaction Reports.

### III. *Suppression of Evidence*

Tobon claims the evidence seized and statements he made shortly after his arrest should have been suppressed because the arrest was illegal. He contends the district court clearly erred in finding that at the time of arrest the surveillance officers had probable cause to believe he was committing a felony. He also claims the court clearly erred in finding exigent circumstances justified this warrantless arrest. We reject Tobon's contentions here.

The trial court's findings of facts supporting a denial of a motion to suppress must be accepted unless clearly erroneous. *United States v. Duckett,* 583 F.2d 1309, 1313 (5th Cir.1978). The court's finding that probable cause existed was supported by Investigator Slovenkay's ob-

servation that Tobon and Roman had gone to several banks, entered separately, made virtually simultaneous cash purchases of cashier's checks, each check being for less than $9,000, and together purchased over $100,000 in cashier's checks during a six-hour time period. Slovenkay testified that he had been advised by banking officials that currency transactions of more than $10,000 would require the banks to file a Currency Transaction Report. We do not believe the district court erred in crediting Slovenkay's testimony and finding that the officers had probable cause to believe Tobon violated currency laws. Second, the court did not err in finding exigent circumstances justified the officers' failure to obtain a warrant before stopping Tobon and Roman and taking them to the police station. The police stopped the car on the interstate because they reasonably believed that evidence could be concealed or destroyed. And, the decision to take Roman and Tobon to the police station rather than waiting for a warrant was reasonable in view of the weather and highway conditions and the officers' inability to communicate with either Tobon or Roman. *See United States v. Watson,* 423 U.S. 411, 423–24, 96 S.Ct. 820, 827–828, 46 L.Ed.2d 598 (1976) (valid warrantless arrest upon probable cause even though adequate time to obtain warrant). Finally, the evidence clearly demonstrates and Tobon does not deny that he voluntarily consented to the search of his car and voluntarily made the inculpatory statements after he was advised of and intelligently waived his *Miranda* rights.

### IV. *Admission of the Gun*

■ Tobon submits he was denied a fair trial by the allegedly erroneous admission of the gun found under the passenger seat of the car. He contends the gun was irrelevant and extremely prejudicial.

Under Fed.R.Evid. 403, a trial court may exclude relevant evidence only if it finds that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant from admitting the evidence. Exclusion of evidence under Rule 403 is an extraordinary remedy and is primarily designed to exclude

"matter[s] of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. McRae,* 593 F.2d 700, 707 (5th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979). The trial court's determination not to exclude evidence under Rule 403 can be overturned on appeal only where "the trial judge has clearly abused his discretion." *United States v. Pomerantz,* 683 F.2d 352, 353 (11th Cir.1982).

We do not believe the trial court abused its broad discretion in admitting the gun here. The gun was relevant to show the existence of the scheme charged; it showed Tobon's planning and preparation to avoid the filing of CTRs on over $185,000. The gun also showed Tobon's effort to protect the $185,000 he possessed and to minimize the risks of the scheme. *See United States v. Masters,* 622 F.2d 83, 85–86 (4th Cir.1980) (evidence admissible in order to complete the story of the crime on trial by proving this immediate context or the "res gestae"); *United States v. Pomerantz,* 683 F.2d at 353 (defendant's possession of gun relevant to support crime of conspiracy to possess marijuana with the intent to distribute). As to the gun's prejudicial effect, the record shows that the testimony about the gun was limited; the government neither accentuated the gun in closing argument nor suggested that Tobon injured or threatened anyone with the gun. Of course, most relevant evidence is prejudicial to an accused. The purpose of Rule 403 is not to preclude the use of prejudicial evidence but the unfair use of prejudicial evidence. *United States v. McRae,* 593 F.2d at 707.

### V. *Closing Prosecutorial Comment*

■ Tobon claims the government prosecutor's comments challenging defense counsel to explain away the evidence constituted an improper comment on Tobon's failure to testify. This claim is patently frivolous and deserves little discussion. The prosecutorial remarks Tobon finds objectionable are the following challenges made to defense counsel Mr. Almon:

Mr. Almon will be up here shortly. He'll be arguing his side of the case, and I'm sure he will do a good job to it, but I

want you to keep one thing in mind, and that is, if he wasn't doing this, what was Mr. Tobon doing?

. . . . .

If Mr. Tobon was doing something other than using a trick, scheme or device to cover up material facts within the jurisdiction of the Department of the Treasury in a manner set out in the Indictment, I ask you to listen and wait and see if Mr. Almon tells you or suggests to you what else it may have been. (TII 208–09).

These statements were neither intended as nor of such character that a jury would naturally interpret them as a comment on the failure of Tobon to testify. *See United States v. Dearden,* 546 F.2d 622, 625 (5th Cir.1977); *United States v. White,* 444 F.2d 1274, 1278 (5th Cir.), *cert. denied,* 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 (1971).

Judgment AFFIRMED.