[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11783
Non-Argument Calendar
_____

D.C. Docket No. 3:18-cr-00085-MMH-PDB-1

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

TRUMAINE MULLER,
Custody,

Defendant–Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 26, 2020)

Before GRANT, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

Trumaine "Lucky" Muller appeals his convictions for distributing a controlled substance resulting in death, in violation of 21 U.S.C. § 841; distributing a controlled substance, in violation of 21 U.S.C. § 841; possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841; and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924.  Muller raises the following arguments on appeal: (1) the district court abused its discretion by allowing evidence of an uncharged drug transaction without prior notice from the government, in violation of Federal Rule of Evidence 404(b); (2)  the court abused its discretion by allowing the government to introduce "historical cell site mapping" to corroborate the testimony of the government's key witnesses; (3) the government's arguments during rebuttal improperly shifted the burden of proof and deprived him of a fair trial; (4) his conviction or sentence for Count 1 should be set aside, under plain error review, because evidence established that an intervening act occurred that absolved him of criminal responsibility for the victim's death; and (5) the court plainly erred by not instructing the jury that his acts were the proximate cause of the victim's death and that his drug offenses had to be committed willfully.  After careful review, we affirm.  We address each issue in turn.

## I. BACKGROUND

Though we write only for the benefit of the parties, we nonetheless set out the facts insofar as they are relevant to the decision we reach. Viewing the evidence in the light most favorable to the jury's verdict, the following events transpired. On November 9, 2016, Tyler Hamilton and his girlfriend, Ariell Brundige, went to work at a Cracker Barrel restaurant. After their shift ended, they were picked up by Chris Williams, a friend of Hamilton's. They wanted to purchase heroin,[1] but they were not able to find any heroin available from their regular dealers. Eventually, at around 10:18 PM, Williams reached out to Trumaine "Lucky" Miller and asked him for two "points" of heroin.

Williams drove to meet Muller at the Cedar Bend apartment complex, where Muller lived. Muller sold Williams two packets of drugs, which were wrapped in aluminum foil, for $40. At the time of the transaction, Williams and Hamilton observed a yellow Ford Mustang in the parking lot, a car that Williams had previously seen Muller drive.

---

[1]      We note that this was the third time in two days that Hamilton had purchased heroin. The first previous occasion occurred on the night of November 8, when he bought heroin from a dealer named Ross, and the second on the morning of November 9, when he purchased heroin from another dealer named "Chop." Hamilton testified that he immediately used the heroin purchased from both Ross and Chop.

3

From there, the group went to Hamilton's house so he could get some personal belongings, because he was planning on spending the night with Williams. Brundige and Williams waited in the car while Hamilton went inside his house—and while inside, he injected himself with half of the drugs that he had purchased from Muller. He suffered a seizure and paramedics were called to the house. Williams and Brundige then went to Williams's house, where Williams divided up the remaining drugs purchased from Muller. He put most of the remainder into a bottle cap, and gave Brundige what was left. Williams then injected his share of the drugs and passed out.

At least several hours later, Hamilton—who had since recovered—called Williams and asked him to pick him up. Williams did so, leaving Brundige at his house watching television. When they returned to the house, Brundige was outside, lying over a bin. They brought her inside and put her on the couch, where she fell asleep. At about 1:30 AM, Hamilton started looking up information on drug overdoses, out of concern that he or Brundige would suffer an overdose.

Several hours later, Brundige started throwing up, and Hamilton did not think that she was breathing. He was not able to find a pulse and called 911. At the direction of the operator, he performed CPR. When the paramedics arrived, they gave Brundige Narcan and epinephrine, but she did not recover and was pronounced dead shortly thereafter.

4

Michael Calhoun, a detective with the Clay County, Florida, Sheriff's Office, arrived at Williams's house several hours later. Though both Williams and Hamilton denied that Brundige's death was linked to drug use, Williams admitted that he had purchased drugs in aluminum foil packets from Muller, who was driving a yellow Mustang, the previous night. He told Calhoun that he had shared one of the packets with Brundige. When Calhoun returned to the house later that day, Hamilton also admitted the drug transaction, giving details similar to Williams'. From there, Calhoun traveled to the Cedar Bend apartment complex. While he was on his way, he passed a yellow Mustang, with a man matching Muller's description sitting in the passenger seat of the car. Calhoun began following the car and observed a drug transaction take place. After the sale, Calhoun effected a traffic stop and searched the car, finding aluminum foil, a purse containing nearly $2,000 in cash, and a cell phone.

When Brundige's autopsy revealed that she had died of a fentanyl overdose, the police conducted a controlled purchase from Muller to see if he was selling fentanyl. Debra Christopher, one of Muller's customers who had since become a confidential informant, purchased what were, at least ostensibly, heroin and crack cocaine from Muller. The drugs were delivered to her in aluminum foil packets, and one of the packets contained a mixture of heroin and furanylfentanyl. A month later, the police arrested Muller and searched his apartment, finding crack cocaine,

5

a mixture of cocaine and furanylfentanyl, a significant amount of cash, a firearm, and other drug paraphernalia.  Muller was subsequently indicted on four counts, two of which he contested: distributing a controlled substance resulting in death, in violation of 21 U.S.C. § 841 (Count 1), and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924 (Count 4).  The case proceeded to trial and the jury found Muller guilty.  He timely appealed his conviction to us.

## II. ANALYSIS

Muller raises five arguments on appeal: that the district court abused its discretion by admitting (1) evidence of the drug transaction observed by Calhoun and (2) the cell tower information; (3) that the government's arguments during rebuttal improperly shifted the burden to Muller and deprived him of a fair trial; (4) that his conviction for causing Brundige's death should be set aside because an intervening act occurred that absolved him of responsibility; and (5) that the district court plainly erred in its instructions to the jury.  We address each in turn, and lay out the facts as relevant.

### A.    *Uncharged Drug Transaction*

Detective Calhoun testified about the traffic stop that he effected on Muller on the same day that Brundige died.  Muller objected to this testimony, arguing that the government was attempting to introduce drug use and money that was

6

uncharged, which was irrelevant and prejudicial.  Specifically, Muller argued that introducing evidence of a prior drug transaction was, in essence, Rule 404(b) evidence that the government did not properly notice.  The government, in turn, argued that it needed to prove a drug deal, that the drug deal led to the overdose death of Brundige, and that, on the day that Brundige was pronounced dead, Muller was riding around in a yellow Mustang selling drugs with packaging similar to that which he sold to Williams.

The district court overruled Muller's objection, concluding that the evidence in question was not covered by Rule 404(b) because it was "part of the entire story and [was] inextricably intertwined."  In any event, even if the information were covered, the probative value of the testimony was not outweighed by the prejudice.  On appeal, Muller once again raises his argument that Calhoun's testimony ran afoul of Rule 404(b).

We normally review a district court's evidentiary rulings for an abuse of discretion.  *United States v. Henderson*, 409 F.3d 1293, 1297 (11th Cir. 2005).  A district court abuses its discretion when it "applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005).  We will not reverse an erroneous evidentiary ruling if the error was harmless.  *United States v. Langford*, 647 F.3d 1309, 1323 (11th Cir. 2011).  An error is

7

harmless if "sufficient evidence uninfected by any error supports the verdict, and the evidence did not have a substantial influence on the outcome." *Id*. (quotation omitted). Evidence admitted in violation of Rule 404(b) is considered harmless if there is other substantial evidence of the defendant's guilt. *See United States v. Chavez*, 204 F.3d 1305, 1317 (11th Cir. 2000).

Rule 404(b) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," unless such evidence is used for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)–(2). In a criminal case, the prosecutor, "[o]n request by a defendant," must: "(A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice." Fed. R. Evid. 404(b)(2)(A)-(B).

Evidence is admissible under Rule 404(b) if: (1) the evidence is "relevant to an issue other than the defendant's character;" (2) "as part of the relevance analysis," there is "sufficient proof so that a jury could find that the defendant committed the extrinsic act;" and (3) "the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must meet the

8

other requirements of Rule 403." *United States v. Phaknikone*, 605 F.3d 1099, 1107 (11th Cir. 2010); *see also* Fed. R. Evid. 404(b).  We apply this test, whenever the extrinsic activity reflects adversely on the character of the defendant, regardless whether that activity might give rise to criminal liability." *Id*. at 1107–08 (quotation omitted).

However, we have stated that "evidence of criminal activity other than the charged offense is not 'extrinsic' under Rule 404(b), and thus falls outside the scope of the Rule, when it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (quotation omitted).  We further explained:

> Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive, and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury. And evidence is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted.

*Id*. (quotation, citations, and alterations omitted).

Regardless of whether the evidence of criminal activity other than the charged offenses falls inside or outside the scope of Rule 404(b), it still must

9

satisfy the requirements of Rule 403.  *Id.*  Rule 403 states that "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  "Of course, most relevant evidence is prejudicial to an accused.  The purpose of Rule 403 is not to preclude the use of prejudicial evidence but the unfair use of prejudicial evidence."  *United States v. Tobon-Builes*, 706 F.2d 1092, 1102 (11th Cir. 1983).

Here, we conclude that the district court did not abuse its discretion by allowing Calhoun's testimony.  His testimony was relevant and necessary to complete the story of the crime and was inextricably intertwined with the evidence regarding the charged offense, and thus outside the ambit of Rule 404(b). Detective Calhoun's testimony completed the story about the charged November 9, 2016, offense, explaining how law enforcement came into contact with Muller in the hours after Brundige's death, and why the officers stopped Muller's vehicle as soon as feasible after observing the uncharged drug transaction.  The search of Muller's vehicle which resulted from that traffic stop revealed that Muller had been selling drugs in the same aluminum foil wrapping as the two packets of drugs which Muller had sold Williams in the charged offense.  The challenged testimony of Detective Calhoun related events that occurred less than twelve hours after the

10

charged offense, at a location very close to the charged offense, and revealed

evidence that was highly probative of Muller's guilt in the charged offense.  We

conclude that the challenged evidence was closely linked in time and circumstance

to the charged offense, formed on integral and natural part of the witnesses'

accounts of the circumstances surrounding the charged offense, and therefore did

not constitute extrinsic evidence subject to Rule 404(b).  We also agree with the

district court that its prejudice did not outweigh its probative value.  Therefore, we

affirm as to this issue.

B.    *Cell Tower Data*

Detective Calhoun testified that, in the course of his investigation following

Muller's arrest, he obtained a court order giving him access to historical cell site

information for the three phones that he had recovered—namely, Hamilton's,

Brundige's, and Muller's—including detailed usage records for all three phones.[2]

He explained that the historical cell site information did not provide him with a

---

[2]    We note that in *Carpenter v. United States*, the Supreme Court held that "the Government must generally obtain a warrant supported by probable cause before acquiring" cell-site location information.  138 S. Ct. 2206, 2221 (2018).  In the proceedings before the district court, the government conceded that it had not applied for a warrant, and that Detective Calhoun had instead sought a court order under state law—which did not require a probable cause showing—to obtain the records.  The district court ultimately concluded that, because the court order was issued prior to the Supreme Court's decision in *Carpenter*, the good-faith exception to the Fourth Amendment applied.  Muller does not challenge in this respect the district court's decision denying his motion to suppress.  Accordingly, we conclude that any *Carpenter* issue in the district court's order is abandoned because it has not been raised on appeal.  *United States v. Mesa*, 247 F.3d 1165, 1171 n.6 (11th Cir. 2001).

precise GPS location for the phones at any given time, but only told him which cell tower the phones used at various points of the night in question. He nonetheless concluded that he was able to loosely corroborate Williams's and Hamilton's narratives with respect to their locations based on the historical cell site information.

Later in the trial, Noel DeLeon, an engineer for AT&T, testified. He explained that, whenever a phone was powered on, or "queued up," it continually searched for the best quality of signal that AT&T provided—which could be from a number of cell towers that were maintained around the area. As the cellphone looked for the best signal, the cell towers communicated back with the cell phone and indicated which tower to "ping" off, which is the tower that would provide the best signal. He explained that AT&T kept historical cell site records, which were generated when a phone call, text message, or data session was initiated on the network.

He identified records kept in the ordinary course of AT&T business for subscriber Donna Hamilton with a phone number ending in 7123 (Hamilton's number), which contained detailed records for calls, texts (without the content), and cell site information. He identified several phone calls between the 7123

12

number and an 8646 number[3] at around 10:30 p.m. on November 9, a 911 call from the 7123 number around 4:00 a.m. on November 10, and the location of the cell towers used —through its corresponding latitude and longitude. He also identified several text messages between the 7123 and 8646 numbers between 10:15 p.m. and 10:32 p.m. on November 9, and the location of the tower used. He identified phone records for a phone with a number ending in 8139 (Brundige's number). He identified data usage by that phone between 10:22 p.m. and 10:30 p.m. and which cell towers were utilized. He explained that cell towers were connected to each other, so, as a phone moved across the network—for example, as its user drives down a road—the towers will track the phone and pass it off to the "next-best serving tower."  Officers were able to obtain the historical cell site data and plot the coordinates of the cell tower on the map.  On cross-examination, DeLeon reiterated that the coordinates are for the cell tower, not the actual location of the phone utilizing the tower. He could not determine the exact location of the phone through the historical cell site data.

Then, Dave Bisplinghoff, an investigator for the local state attorney, testified.  Bisplinghoff said that he used Muller's, Hamilton's, and Brundige's cell phone records to map out the location of the cellphone towers that these three

---

3    Testimony from Kenneth Lecesne, a records custodian for T-Mobile, identified the 8646 number as belonging to Muller.

13

phones were using on November 9 between 10:14 and 10:32 PM. He explained that the cell tower that Muller's phone used was less than one mile from his home, and that between 10:21 and 10:31 PM, Muller's, Hamilton's, and Brundige's phones were all utilizing this cell tower. Similarly, between 11:07 and 11:17 PM, Hamilton's cell phone used the cell tower closest to his home, and between 11:56 PM and 5:16 AM, Hamilton's cell phone used the cell tower closest to Williams's home. Between 10:43 PM and 5:27 AM, Brundige's cell phone used a cell tower closest to Williams's home, as well.

Bisplinghoff reiterated that the cell site information was only for the location of the cell tower, not the phones, and that cell phones are constantly looking for the strongest signal, which is *usually*, though not *always*, the closest tower. On cross-examination, Bisplinghoff conceded that he could not tell based on the information which side of the tower the cell phones were hitting off of, and that a cell phone may well use a tower further away than a closer one.

Muller objected to Bisplinghoff's testimony, along with the maps of the cell towers that the government sought to admit. He argued that the government failed to lay the proper foundation as to whether Bisplinghoff was qualified to testify about the cell site information, and that the government needed to present an expert. The government responded that the proper foundation was laid through DeLeon, who laid out in his testimony the records and the locations of the towers.

14

Muller replied that he acquiesced to the introduction of the cell tower locations, but that the exhibits—which ostensibly showed that the cell phones were in a limited area during the night in question—were confusing.

The district court overruled Muller's objection. It concluded that DeLeon adequately explained how cell phones connect with the closest tower and that Muller's arguments with respect to the location of the cell phones to the towers went to the weight of the evidence, not to admissibility. However, the court admonished the government to be careful with its language to ensure that the maps showed the locations of the *towers*, not the *phones*.

Muller raises a similar argument on appeal, namely, that the testimony regarding the cell tower information lacked a sufficient foundation. As stated previously, we normally review a district court's evidentiary rulings for an abuse of discretion, *Henderson*, 409 F.3d at 1297, which applies when the district court "applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment," *Brown*, 415 F.3d at 1266, and we will not reverse an erroneous evidentiary ruling if the error was harmless, *Langford*, 647 F.3d at 1323. Additionally, we review a district court's ruling on authentication for abuse of discretion. *United States v. Brown*, 587 F.3d 1082, 1092 (11th Cir. 2009).

15

Under Rule 901(a) of the Federal Rules of Evidence, "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *See also United States v. Lanzon*, 639 F.3d 1293, 1301 (11th Cir. 2011) (finding that the testimony of a police detective that participated in the creation of an instant message transcript was sufficient to authenticate the transcript at trial). The government's burden is not an onerous one; "[t]he proponent need only present enough evidence to make out a prima facie case that the proffered evidence is what it purports to be." *Id*. at 1301. A district court, moreover, is given discretion to determine authenticity, and we will not overrule its determination on appeal "absent a showing that there is no competent evidence in the record to support [the district court's determination]." *Id*.

Based on the record before us, we cannot conclude that the district court abused its discretion in this regard. We conclude that a proper foundation was laid and sufficient safeguards were employed to prevent confusion. Several different witnesses explained the nature of the cell tower information—some, like DeLeon, in great detail—and as a result, we are satisfied that the information was properly introduced.

We further note that, even if the district court abused its discretion in allowing such evidence, any error would have been harmless. While the cell tower

16

information may have been greatly emphasized by the government, we think that it was likely of middling importance to the trial's ultimate outcome. At best, it merely corroborated Hamilton's and Williams's testimony and what they told the police and suggested that no other drug deals took place on the night in question. And at worst, it was marginally relevant information that related to a relatively unimportant aspect of the trial. Accordingly, we affirm in this respect.

C.    *The Prosecution's Comments During Rebuttal*

Third, Muller argues that the prosecution improperly shifted the burden of proof to him during its remarks during rebuttal. During rebuttal, the prosecution was responding to Muller's argument that another drug dealer could have provided the deadly drugs. The prosecution noted that, based on the cell tower information, none of the parties had texted or called another drug dealer between 12:00 and 1:32 AM, when Hamilton began searching on the internet for overdose symptoms. The prosecutor then posed a rhetorical question: "Is there any evidence that from midnight to 1:32 that anybody else was over at that house except for Hillary Hamilton coming to get into it with her brother?"[4] Muller objected to the prosecution's argument and the district court instructed the jury to disregard the prosecutor's rhetorical question. The prosecution then continued by noting, "There

---

[4]    Here, we note that Hamilton's sister arrived at Williams's house and got into an argument with Hamilton over his quick departure from the hospital after recovering from his seizure. Neighbors called the police, who arrived at the scene and did not enter the house.

17

is no evidence . . . that anyone other than [Hamilton's sister] came over to that house that night, none, from midnight to 1:32." On appeal, Muller argues that, by asking the rhetorical question, the prosecution improperly shifted the burden of proof to him.

We review issues of prosecutorial misconduct *de novo*. *United States v. Noriega*, 117 F.3d 1206, 1218 (11th Cir.1997). "Prosecutorial misconduct requires a new trial only if we find the remarks (1) were improper and (2) prejudiced the defendant's substantive rights." *United States v. Hernandez*, 145 F.3d 1433, 1438 (11th Cir. 1998) (internal quotation omitted). *See also United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006) ("A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different."). To determine the prejudicial impact of the prosecutor's statements, we "must evaluate them in the context of the trial as a whole and assess their probable impact on the jury." *Id.*

In a criminal proceeding, the government has the burden of proving every element of the charged offense beyond a reasonable doubt. *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). During closing arguments, "prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." *Id*. However, a prosecutor is allowed to "comment on the failure of the defense, as

18

opposed to that of the defendant, to counter or explain the testimony presented or evidence introduced." *United States v. Johnson*, 713, F.2d 633, 651 (11th Cir. 1983). "[P]rejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof." *Simon*, 964 F.2d at 1087.

Here, we conclude that the prosecutor's comments during his rebuttal argument did not impermissibly shift the burden of proof to Muller. The prosecutor's comments were in response to Muller's theory that the drugs that killed the victim could have come from numerous other sources and not him, and thus, were the type of arguments that commented on the failure of the defense, not the defendant, and were allowed. Furthermore, even if the government's argument did impermissibly shift the burden, they were quickly cured by the court's instruction to the jury to disregard the government's comments, and further cured by the courts instruction to the jury that the burden of proof rested on the government's shoulders alone. Accordingly, we affirm in this respect as well.

D.    *The Alleged Intervening Act*

Muller next argues that his conviction for Count I should be set aside because the evidence established that an intervening act occurred that absolved him of criminal responsibility for Brundige's death. Because Muller distributed the drugs that the jury found resulted in the death of Brundige, Muller would

ordinarily be liable under 21 U.S.C. § 841(a)(1).  That statute provides that it is unlawful for any person to knowingly or intentionally distribute a controlled substance.  Fentanyl is a controlled substance.  21 U.S.C. §§ 802(6), 812(b)(6).  And if any person who distributes a controlled substance "after a prior conviction for a felony drug offense has become final," where "death … results from the use of such substance shall be sentenced to life imprisonment."  21 U.S.C. § 841(b)(1)(C).

On appeal, Muller argues that an intervening act breaks the chain of causation between his sale of the drug and the death of Brundige.[5]  Specifically, he argues that Hamilton's conduct intervened and extinguished his criminal responsibility.  He argues this is so because Hamilton failed to get help for Brundige, despite knowing the drugs were toxic, and did not summon help after Brundige passed out until it was too late.

Muller faces a substantial hurdle because he did not request a jury instruction with respect to intervening cause.  Nor did he assert intervening cause as a basis for his motions for judgment as a matter of law.  Thus, we construe Muller's intervening cause argument—raised for the first time on appeal—as an

---

[5] We have never decided whether there is an intervening cause exception to the death results sentence enhancement of § 841(a)(1)(C). *See United States v. Rodriguez*, 279 F.3d 947, 951 n. 5 (11th Cir. 2002).  In this case, we can assume *arguendo*, but we expressly do not decide, that the intervening cause doctrine can operate to extinguish criminal liability under § 841(a)(1)(C).

argument that the district court should have *sua sponte* granted a judgment of acquittal on the ground that Hamilton should have intervened and saved Brundige from dying as a result of the drugs that Muller sold.

We construe Muller's new argument on appeal as a challenge to the sufficiency of the evidence. We note that ordinarily we would review a sufficiency challenge *de novo*. However, when a defendant did not move for a judgment of acquittal on the ground relied upon for the first time on appeal, we no longer review *de novo*. *See United States v. Hunerlach*, 197 F.3d 1059, 1068 (11th Cir. 1999) (where the defendant asserted for the first time on appeal a ground not argued in the district court in support of his motion for judgment of acquittal, we review "the district court's decision to deny the motion for judgment of acquittal on that basis only for 'plain error'").

In any event, we cannot conclude that there is error, much less plain error. Without objection, the district court charged the jury:

> The Defendant can be found guilty of the crime charged in Count One only if all the following facts are proved beyond reasonable doubt:
>
> (1)    The Defendant distributed a mixture of substance containing a detectable amount of fentanyl; and
>
> (2)    The Defendant did so knowingly and intentionally. . . .
>
> If you determine that the Defendant distributed the controlled substance as charged in Count One, you must also determine whether [Brundige's] death resulted from the use of the controlled substance distributed by the Defendant. To establish that [Brundige's] death

21

resulted from the use of the mixture and substance containing a detectable amount of fentanyl distributed by the Defendant, the Government must prove that [Brundige's] use of the fentanyl distributed by the Defendant was the "but for" cause of her death.

"But for" causation is proven when you find beyond a reasonable doubt that had [Brundige] not taken the fentanyl distributed by the Defendant, then [Brundige] would not have died.

Thus, the jury found beyond a reasonable doubt that had Brundige not taken the drugs distributed by Muller, she would not have died. Although Muller's counsel did not request a jury charge that Hamilton's failure to save Brundige was an intervening cause, he did assert in his closing argument to the jury that Hamilton had caused her death. The jury rejected Muller's argument. We cannot conclude that there is insufficient evidence in the record to support that finding. And we certainly cannot conclude that there is plain error.

E.    *Jury Instructions*

Finally, Muller argues that the district court plainly erred by failing to instruct the jury that it must find beyond a reasonable doubt that his actions were committed willfully and were the proximate cause of Brundige's death in addition to the but-for cause. We affirm in this respect, because Muller invited any error pertaining the court's instructions.

Jury instructions that are challenged for the first time on appeal are reviewed for plain error. *United States v. Felts*, 579 F.3d 1341, 1343 (11th Cir. 2009). "A district judge is vested with broad discretion in formulating a jury charge so long

22

as the charge as a whole accurately reflects the law and the facts." *Id*. at 1344 n.1. We will not reverse a conviction on the basis of an improper jury charge unless "the issues of law were presented inaccurately, the charge included crimes not in the indictment, or the charge improperly guided the jury in such a substantial way as to violate due process." *Id*. When a party "induces or invites" the district court into making an error, the doctrine of invited error precludes the party from seeking review of that error on appeal. *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009). Merely failing to object to the jury instructions does not trigger the doctrine of invited error. *United States v. Dortch*, 696 F.3d 1104, 1112 (11th Cir. 2012). But, "[w]hen a party responds to a court's proposed jury instructions with the words 'the instruction is acceptable to us,' such action constitutes invited error." *United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005). Also, the doctrine of invited error applies when the defendant "not only agreed with the [instruction], but requested [it]." *United States v. Frank*, 599 F.3d 1221, 1240 (11th Cir. 2010).[6]

---

[6] Although we do not address the merits of the issues underlying the instructions Muller challenges, we note the following. In proving the "resulting in death" sentencing enhancement in a prosecution under 21 U.S.C. § 841(a)(1), the Supreme Court has held that "where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." *Burrage v. United States*, 571 U.S. 204, 218-19 (2014). As noted above, the district court did instruct the jury that it must find that Muller's distribution of the drug was the but-for cause of Brundige's death. Also, we have concluded, while agreeing with many sister circuits, "that the plain and unambiguous

The jury instructions that Muller proposed did not require the government to prove that the drugs that Muller distributed were the proximate cause of the victim's death or that the government was required to show willfulness. Additionally, during the charge conference, the court specifically asked the parties if there were any objections to its instruction, which also did not have a proximate cause or willfulness requirements and was relatively identical to Muller's proposed instruction, and whether the parties had any alternative instructions the parties would have liked to propose. Muller did not object to the court's instructions or propose an alternative instruction with a proximate cause or willfulness requirement. Muller also did not object to the court's instructions after they were read to the jury.

Accordingly, because the court gave an instruction that was nearly identical to the one Muller proposed, and because he informed the court that its instruction was acceptable, Muller invited any error as it pertains to this issue, and we affirm in this respect.

### III. CONCLUSION

For the foregoing reasons, Muller's conviction is

---

language of § 841(b)(1)(C) contains no foreseeability or proximate cause requirement." *United States v. Webb*, 655 F.3d 1238, 1254 (11th Cir. 2011).

**AFFIRMED**.