**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Mariano HERNANDO OSPINA, Mauricio Lehrer, Defendants-Appellants.**

**No. 85–5199.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 15, 1986.

---

Bruce Rogow, Ft. Lauderdale, Fla., for defendants-appellants.

Melvyn Kessler, Miami, Fla., for Lehrer.

Leon B. Kellner, U.S. Atty., Paul DiPaolo, Nancy L. Worthington, Leon B. Kellner, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before GODBOLD and FAY, Circuit Judges, and PECK,* Senior Circuit Judge.

PER CURIAM:

Appellants Mauricio Lehrer and Mariano Hernando Ospina appeal their convictions for various financial reporting requirement-related offenses arising from their laundering of approximately $1.3 million in narcotics proceeds over a four week period in the Southern District of Florida. Finding no error, we affirm.

## I. FACTS

The events [1] leading to the appellants' convictions began on May 30, 1984 when

---

* Honorable John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. Our recital of the facts is taken primarily from the trial testimony of Agent Velasco, who is a Special Agent with the United States Customs Service assigned to Operation Greenback in the Southern District of Florida. Operation Greenback was created to investigate schemes designed to conceal the source and origin of cash money, i.e., money laundering. Agent Velasco

Special Agent William Velasco, acting in an undercover capacity, met with appellant Mauricio Lehrer at Velez Tours, a travel agency owned by Lehrer which is located in a Miami office building. Velasco had met with Lehrer about twelve times previously and discussed with him the laundering of money through the exchange of U.S. dollars for pesos. On this date, Lehrer asked the agent if he was able to exchange currency for checks. Velasco told Lehrer that he could, and that he would charge a two percent fee for the service. Lehrer stated that the fee was high and, in consideration of the fact that he had a lot of clients who had dollars to move, he should be given a lower rate. Velasco, however, told Lehrer that the rate was not negotiable and that the risk involved justified the two percent commission. Velasco explained to Lehrer that the problem with buying cashier's checks and money orders was that government forms[2] had to be filled out reporting cash transactions. In order to avoid the filing of the government forms, multiple checks would have to be purchased in amounts of less than $10,000. Lehrer stated that he understood the problem and that he would contact the agent within a few days.

Two weeks later, on June 11, 1984, Lehrer called Velasco and asked if he was still able to exchange currency for checks. Velasco told Lehrer that he could, and a meeting was arranged for the next day at Velez Tours. On June 12, 1984, the first in a series of five transactions occurred. Velasco arrived that morning, at approximately 10:00 a.m., at the office of Velez Tours accompanied by IRS Special Agent Pete Abalia.[3] Lehrer escorted the agents into his private office and stated that he had

$250,000 in cash to exchange for cashiers checks. Lehrer asked what the rate would be. Velasco replied, as he had indicated at their May 30th meeting, that the rate would be two percent of the total amount exchanged. Lehrer again asked if the agent could exchange dollars for pesos and Velasco replied that he could not. Lehrer then left the office, saying that he was going to talk with the owner of the money to see if he was willing to pay the commission. Within a few minutes, Lehrer returned and stated "we'll go on ahead and conduct the business." Lehrer and Velasco again discussed the "problem" with having to file currency transaction report (CTR) forms. Lehrer stated that he wanted to receive checks made payable to Hector Suarez by 2:30 p.m. that day. When Velasco told Lehrer that it would be impossible to convert that amount of cash into multiple checks in amounts less than $10,000 by 2:30 p.m., Lehrer stated he did not care if the checks were large or small. Velasco then told Lehrer that he could obtain large checks through a connection he had at the bank, however, he explained he did not like using that method too often because he would have to pay to not have the CTR forms filed. Lehrer responded, "that's fine," and Velasco then agreed to accept the currency and return the checks by 3:00 p.m. Lehrer thereupon stated that his client had five million dollars to exchange and was a good customer and asked the agents to follow him out to the parking lot to get the $250,000. As the agents were preparing to leave, Lehrer asked the agents to "take out another two percent for him as his commission on the transaction." When the agents were walking towards the elevator with Lehrer, Rudolfo

regularly works in an undercover capacity by assuming the identity and role of an individual who can provide money laundering services.

2. Velasco was referring to currency transaction report (CTR) forms. The Currency Transaction Reporting Act, 31 U.S.C. § 5313 (1982), authorized the Secretary of the Treasury to require the reporting of domestic currency transactions. Pursuant to this authority, the Secretary promulgated 31 C.F.R. § 103.22(a)(1) (1985) which

requires a CTR to be filled out by each financial institution in connection with "each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000." CTR's are filed on Internal Revenue Service Form 4789.

3. Agent Abalia was also assigned to Operation Greenback.

Ospina [4] also exited Velez Tours and entered the elevator. They all proceeded down to the parking lot, and Lehrer directed the agents to follow Rudolfo Ospina to a brown Toyota. At the car, Ospina removed a brown paper bag from the back seat and handed it to Agent Abalia. This bag contained currency and was transported to the office of Operation Greenback, where it was counted.

The currency amounted to $249,940, $60 short of $250,000. One $20 bill was counterfeit. Five thousand dollars was retained as the two percent charged by the agents, and an additional two percent was retained for Lehrer. Velasco and Abalia, who identified themselves as government agents, then converted the currency into five cashiers' checks at Flagship National Bank (Flagship), payable to Hector Suarez. No CTR's were filed by Flagship in connection with this or any of the four later currency transactions in this case. At approximately 3:00 p.m., the agent returned as promised to Velez Tours and gave Lehrer the cashier's checks and $5,000 cash. The cashier's checks were later deposited to Rudolfo Ospina's trading account at Refco, Inc., a commodities trading business, located upstairs in the same building as Velez Tours.

The second transaction commenced in a similar fashion with Lehrer contacting Velasco on June 19, 1984 and requesting a meeting the following morning so that Velasco could pick up some currency to exchange into checks. The next morning when Velasco and Abalia arrived at the office of Velez Tours, Velasco told Lehrer that he had a problem with his "contact" at the bank. Velasco explained that the contact wanted to increase the commission by one percent, due to some recent arrests in Miami which made it very "hot" for this type of dealing. Velasco also told Lehrer that according to the bank contact, he (Velasco) was required to fill out a CTR form each time he received money and that Lehr-

er also was required to fill out this form upon receiving money, in that both he and Lehrer were acting as financial institutions. Lehrer responded, "Yes, fine, but I am not going to pay the extra commission." Velasco told Lehrer that to make things easy Velasco could file the required forms and thereby report the transactions to the government. Lehrer replied, "No, no. We don't want anything to do like that," and then asked, "You haven't recorded anything on the other prior transactions, have you?" Velasco answered "No." Lehrer then stated he was going to call the owner of the money whereupon he had a phone conversation in Velasco's presence with "Mariano". Upon hanging up, Lehrer asked Agents Velasco and Abalia to go with him to meet the individual in the parking lot. They all proceeded down in the elevator to the first floor of the building where they met appellant Mariano Ospina, who was waiting outside the elevator. Mariano Ospina handed Velasco a piece of paper with the names "Hector Suarez" and "Pedro Luis Diaz." Next to the name "Diaz" was the number "76 with a circle around it." Mariano Ospina stated that the checks were to be made out in these two names and that the one for Diaz had to be for exactly $76,000. Mariano handed a briefcase to Agent Abalia and then left in the waiting elevator. Lehrer then instructed Velasco to bring him his commissions out of the money going to the Suarez check and none from that going to Diaz.

Velasco took the briefcase to the Customs Office at Miami International Airport. The money was taken out of the briefcase and subjected to an examination by a trained narcotics detector dog, Prince, who alerted, i.e., reacted positively to the presence of narcotics scent on the money. Velasco then took the money to the offices of Operation Greenback for counting. It amounted to $100,000, which the agents then converted at Flagship into two cash-

---

**4.** Rudolfo Ospina is appellant Mariano Ospina's brother. Although he was charged in the indictment, he has not yet been apprehended and, thus, has not been tried in connection with the transactions in this case.

iers checks in the amounts of $76,000 [5] and $20,000. Velasco returned to Velez tours at 2:30 p.m. and gave Lehrer the two checks, his $2,000 commission in cash, and the briefcase. Lehrer, stating that he had to take the checks to the man who was getting nervous, then left and took the elevator up. The check for $20,000 was later deposited to Rudolfo Ospina's account at Refco.

The third transaction took place the morning of June 26, 1984 when Agents Velasco and Abalia went to the parking garage of Lehrer's office building. Velasco went up to meet Lehrer at Velez Tours. After calling upstairs to Mariano Ospina to advise him that Velasco had arrived, Lehrer and Velasco left the office and proceeding to the elevator where they met Ospina and descended to the garage. As Velasco, Ospina and Lehrer approached the parking garage, Rudolfo Ospina walked up and spoke with Mariano. Rudolfo appeared to be nervous. Lehrer told Velasco that the Ospinas were afraid because there was a car in the garage with two men inside, whom the Ospinas suspected were police. At Lehrer's instruction, Velasco and Abalia then left the area for ten minutes and returned just as Rudolfo's car pulled up. The agents met with Lehrer, Mariano Ospina and Rudolfo Ospina. Rudolfo Ospina got out of the car with a briefcase and motioned for Velasco to follow him. He then walked to a public telephone located in the garage and pretended to make a telephone call. Rudolfo laid the briefcase down and motioned for Velasco to pick it up. Velasco did so, and the agents returned to Operation Greenback.

Prior to counting the currency, a second U.S. Customs narcotics detector dog, Rebel, examined the briefcase and currency.

He alerted to the scent of narcotics on the currency which totalled $322,000. Commissions were withdrawn, and Abalia purchased cashier's checks at Flagship with the remaining currency. Pursuant to previous instructions from Lehrer, six cashier's checks totalling $309,100, payable to Hector Suarez were obtained. Velasco then met with Lehrer at his office that afternoon and gave him the six cashier's checks and the briefcase. Lehrer said he would probably have approximately $200,000 for exchange the next day. All six checks were later deposited to Rudolfo Ospina's account at Refco.

On the morning of the fourth transaction, July 6, 1984, Velasco and Abalia again went to the office of Velez Tours to meet with Lehrer at his request. Lehrer told the agents that he had $200,000 in cash for conversion into cashier's checks and that an additional $8,000 was included to cover the commissions. Lehrer stated that the checks had to total exactly $200,000 and that they were to be made payable to Refco, Inc.[6] During this conversation Lehrer explained that Refco was the business upstairs; that it dealt in gold and commodities; and that Mariano and Rudolfo Ospina were the owners.[7] Velasco then stated that the money received from them was extremely dirty and always had a very powdery substance on it. Further, that each time Agents Velasco and Abalia counted the money with the counting machine, a little cloud came up and they ended up with headaches. Lehrer responded: "Yes. Yes, I know," and, "That's the business these people are in." He went on to say, "But they are very wealthy and they are part of a large chain of people. But I don't ... get involved in that end of it myself." "I only handle the money, the money transactions."

---

**5.** The check for $76,000 was used by Rudolfo Ospina to purchase a single engine Cessna airplane from Pedro Diaz. Ospina used the alias Evan Goldstein in the transaction and the title to the plane was placed in this name.

**6.** Apparently the depositing of the cashier's checks had created a problem for Refco because they were third party checks and Refco's bank would not accept them. Consequently, according to the trial testimony of Refco's office manager, Rudolfo was told that no further third party checks would be accepted by Refco.

**7.** This statement by Lehrer was incorrect. The Ospina's were only clients of Refco, although Mariano did sublet office space inside Refco's suite.

During this same meeting, Lehrer stated that Mariano Ospina was his client and that Mariano would not go any further than the elevator to meet Velasco because he was afraid to be seen. Lehrer and Velasco proceeded to the elevator and when it opened on the fourth floor, Mariano Ospina was in it. Velasco and Lehrer entered the elevator and Ospina asked Lehrer if Velasco knew to make the checks out to Refco. Velasco responded that he had already been given those instructions, and Ospina then gave him a briefcase. The agents subsequently returned to Operation Greenback. Prior to counting the currency, Rebel alerted to the presence of narcotics odor on it. The total amount of the currency was $207,960.

At approximately 3:30 p.m. Velasco returned to Velez Tours and gave Lehrer four cashier's checks obtained at Flagship and the briefcase. Lehrer asked Velasco to follow him out to the elevators and to carry the briefcase. Lehrer explained that he did not want his employees to see Velasco leave without the briefcase. At the elevator, Velasco gave Lehrer the briefcase and observed Lehrer enter the elevator and proceed up. The four checks later were deposited to Rudolfo Ospina's account at Refco and were subsequently transferred to Refco's capital account in New York City.

The fifth transaction took place on July 12, 1984 when Velasco again met with Mauricio Lehrer at Velez Tours. Lehrer told Velasco that he had another customer in Los Angeles and he asked Velasco if he could travel to Los Angeles and pick up $100,000 in cash, and then convert it to checks. Velasco declined, stating that the amount of money did not justify the trip to

California. Lehrer stated that things were looking good and that he had found another client with four to five million dollars to be exchanged on a weekly basis. Lehrer suggested that he and Velasco set up a large organization to launder this cash. Lehrer then told Velasco that he now had $500,000 to exchange and instructed Velasco to make the requested cashiers checks out to BAC International.[8] Velasco and Lehrer then left the office and proceeded to the elevator where they were again met by Mariano Ospina. Ospina repeated Lehrer's instructions to Velasco to make the checks out to BAC International. Ospina, Lehrer and Velasco went to the lower parking garage, and Ospina asked the agent to drive his car around to the lower floor so as not to be seen. Velasco drove his car into the garage and parked next to Ospina's car. Ospina opened the trunk and removed two packages wrapped in brown grocery bags and placed them on the back seat of Velasco's car. Ospina then told the agent that he would have another $500,000 the next morning or the day after. The currency was taken to the offices of Operation Greenback and examined there again by Rebel, who alerted to the presence of narcotics. Velasco later obtained six cashier's checks at Flagship with BAC International as the payee. Velasco returned the checks and a $10,000 commission to Lehrer later that day, keeping $10,000 as his two percent commission. These checks were deposited to the Ospina's corporate account at BAC International Bank on July 17th. That same date a deposit was also made to the corporate account via a wire transfer of $500,000 from Refco's capital account in New York. On July 23, 1984 a second wire transfer in the amount of $200,000 was

8. BAC International is a Grand Cayman bank with its main office in Costa Rica. BAC is not chartered to engage in banking transactions in the United States, however, it has a wholly owned business named BAC International Credit Corporation, located directly next door to Refco. BAC Credit Corporation engages in international finance and assists foreign customers with established offshore accounts. Mariano Ospina had earlier opened a corporate account at BAC International Bank in Costa Rica with the assistance of the manager of BAC Cred-

it Corporation in Miami. The account was for a corporation named Agro Industrial Isabela, however, it was opened with no name on it pursuant to Mariano Ospina's instructions. Rudolfo and Mariano were both listed as officers in the articles of incorporation Mariano was required to provide in connection with the opening of the account. Mariano also had a personal account with BAC International. The statements on both accounts were sent to BAC Credit Corporation in care of the manager from whom Mariano would personally pick them up.

made from the Refco capital account to the corporate account. Both wire transfers were made at the direction of Rudolfo Ospina. The corporate account thus showed July, 1984 total deposits of $1,200,000,[9] funds which all originated from the cashier's checks obtained from Velasco in connection with the currency exchanges in this case.

A federal grand jury, in a superseding indictment, charged appellants with five substantive counts [10] of concealing from the IRS, by scheme and device, material facts, i.e., the existence, source and transfer of approximately $1.3 million in cash, in violation of 18 U.S.C. § 1001 (1982) [11] and 18 U.S.C. §§ 2(a)–(b) (1982).[12] As part of the scheme to conceal, it was charged that appellant Mariano Ospina aided and abetted appellant Mauricio Lehrer, who was acting as a domestic financial institution, in

failing to file CTR's on the five cash transactions set out as substantive charges in Counts Two through Six of the indictment, and that the appellants caused Flagship to fail to file CTR's in connection with the same cash transactions.

In addition the appellants were charged with one count of conspiracy, under 18 U.S.C. § 371 (1982),[13] the three objectives of which were to defraud the IRS by impairing, obstructing and defeating its function of collecting data and reports of currency transactions; to conceal material facts relating to currency transactions in violation of 18 U.S.C. § 1001; and to use interstate commerce to facilitate a business involving narcotics and controlled substances, in violation of 18 U.S.C. § 1952 (1982).[14] After a jury trial, appellants were found guilty on all six counts.

9. Because BAC does not engage in banking activities in the United States, see *supra* n. 8, the direct deposits and wire-transfers of the Ospinas for the corporate account were made to a correspondent bank of BAC, which was generally Wells Fargo Bank in Miami. From the BAC corporate account, Rudolfo Ospina purchased an $800,000 certificate of deposit and a loan of $180,000 was arranged for Mariano Ospina, guaranteed by a $200,000 certificate of deposit. In addition to that loan, which covered an overdraft in his personal BAC account, Mariano also received two corporate checks, totalling $14,000.

10. Counts Two through Six related to the following five currency transactions:

| Date | Amount |
| --- | --- |
| 6–12–84 | $ 239,940 |
| 6–20–84 | 96,000 |
| 6–26–84 | 309,100 |
| 7–06–84 | 200,000 |
| 7–12–84 | 500,000 |
| | $1,345,040 |

11. 18 U.S.C. § 1001 (1982) provides in pertinent part:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... conceals or covers up by any trick, scheme, or device a material fact, ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

12. 18 U.S.C. § 2 (1982) reads:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

13. 18 U.S.C. § 371 (1982) provides in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

14. 18 U.S.C. § 1952 (1982) provides in pertinent part:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
(1) distribute the proceeds of any unlawful activity; or
(2) commit any crime of violence to further any unlawful activity; or
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

The principal arguments on appeal are that venue was improper; that the evidence was insufficient to sustain the convictions on the concealment and conspiracy counts; and that the trial court erroneously admitted testimony of the dog alerts and a co-conspirator statement by Lehrer relating to the Ospinas' involvement in the narcotics business.

## II. VENUE

We address at the outset appellant Lehrer's contention that venue in the Southern District of Florida for the five substantive Counts (Two through Six) of the indictment was improper. Lehrer argues that he was essentially charged in those counts with failing to file and causing the non-filing of CTR's and, therefore, venue was proper only in Washington, D.C. where, pursuant to 31 C.F.R. § 103.25 (1985), CTR's are directed to be filed. *See Johnston v. United States*, 351 U.S. 215, 220, 76 S.Ct. 739, 742, 100 L.Ed. 1097 (1956) (footnote omitted) ("where the crime charged is a failure to do a legally required act, the place fixed for its performance fixes the situs of the crime."). Lehrer is mistaken, however, in characterizing the nature of the offense charged in those counts as comprising solely a failure to do the legally required act of filing CTR forms. He was not charged with the substantive offense of failure to file CTR forms pursuant to the Currency Transaction Reporting Act, 31 U.S.C. § 5313 (1982) (Reporting Act) and its implementing regulation. *See supra* n. 2. Rather, the substantive counts of the indictment charged a continuing series of affirmative acts relating to a scheme to obstruct the effective functioning of the IRS by concealing the existence, source and transfer of the $1.3 million in question

in violation of 18 U.S.C. § 1001 and 18 U.S.C. § 2(a)–(b). The non-filing and causing the non-filing of CTR's formed part of that scheme to conceal.

■ In determining venue in section 1001 cases, courts have relied on the general venue statute, 18 U.S.C. § 3237(a) (Supp. II 1984),[15] which provides that venue is proper in any district in which the offense is "begun, continued, or completed," *see e.g., United States v. Herberman*, 583 F.2d 222, 226 (5th Cir.1978);[16] *United States v. Ruehrup*, 333 F.2d 641, 643 (7th Cir.), *cert. denied*, 379 U.S. 903, 85 S.Ct. 194, 13 L.Ed.2d 177 (1964), and we conclude that section 3237(a) is similarly applicable to the section 1001 prosecution in this case. It is undisputed that the scheme to conceal was formulated and virtually all the affirmative acts comprising that scheme were carried out in the Southern District of Florida: the $1.3 million in cash was accumulated and transferred there to the undercover agents; thereafter, it was exchanged in the district for cashier's checks and these checks were ultimately deposited there. Accordingly, we find that the government has sustained its burden of proving by a preponderance of the evidence that venue under section 3237(a) was proper in the Southern District of Florida. *See United States v. Rivamonte*, 666 F.2d 515, 517 (11th Cir.1982).

## III. SUFFICIENCY OF THE EVIDENCE

Appellants contend that the evidence presented at trial was insufficient to sustain their convictions on the concealment and conspiracy counts. In reviewing the sufficiency of the evidence we must view all the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86

(b) As used in this section 'unlawful activity' means (1) any business enterprise involving ... narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act) ...

15. 18 U.S.C. § 3237(a) (Supp. II 1984) reads: Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and

completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

16. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc) we adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

L.Ed. 680 (1942), and all reasonable inferences from that evidence must be drawn in favor of the jury's verdict. *See id.; United States v. Johnson,* 713 F.2d 654, 661 (11th Cir.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). In addition, our review is limited to determining whether "a reasonable trier of fact could find that the evidence establishe[d] guilt beyond a reasonable doubt," *Johnson,* 713 F.2d at 661; *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (footnote omitted) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983),[17] regardless of whether that evidence is direct or circumstantial. *See Bell,* 678 F.2d 549 n. 3.

### 1. The Section 1001 Concealment Counts

As noted previously, *see supra* at 1576, the theory of the five substantive concealment counts (Two through Six) is that appellant Lehrer was a financial institution, required to file CTR's and appellant Mariano Ospina aided and abetted his non-filing or, in the alternative, that appellants caused Flagship to not file CTR's. Appellants claim, however, that the evidence failed to establish that either Lehrer or Flagship National Bank had a duty to file CTR forms in connection with the currency transactions in this case, and therefore, their section 1001 convictions for concealing these transactions must fail. Further, appellants argue that even assuming a proven duty to file on the part of either Lehrer or Flagship, the evidence failed to show appellants had the requisite knowledge of the reporting requirement or the specific intent to violate it. We address the issue of the duty to file CTR's and the issue of knowledge and intent seriatim.

### A. *The Duty to File*

■ It is clear that in order to support a section 1001 concealment conviction there must be a legal duty to disclose the facts the defendant was convicted of concealing. *See United States v. Tobon-Builes,* 706 F.2d 1092, 1096–1097 (11th Cir.1983). It is equally clear that, pursuant to the Reporting Act 31 U.S.C. § 5313 and its implementing regulation 31 C.F.R. § 103.22(a)(1), *see supra* n. 2, the duty to file CTR's is the financial institution's, not the customer's. While banks are certainly financial institutions, *see* 31 C.F.R. § 103.11(1), persons may also be. Lehrer's status as a financial institution was claimed by the government to be set forth in 31 C.F.R. § 103.11(3) which provides: "A person who engages as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks." While all financial institutions pursuant to 31 C.F.R. § 103.-22(a)(1) are required to report transactions in currency of more than $10,000, they need not report such transactions with government agencies. *See* 31 C.F.R. § 103.22(b)(2)(iii).[18] Based upon these regulatory provisions, appellants' argument concerning the duty to file in this case is, therefore, two-fold. First, they claim that Lehrer was not proven to be a financial institution, and thus had no duty to file; second, they claim that Flagship, while a financial institution, had no duty to file because the currency transactions in question were conducted by government agents who were exempt from the reporting requirement. We reject both arguments.

■ First, as regards Lehrer's status as a financial institution, we find the evidence was more than sufficient to show that Lehrer was engaged in the "business" of exchanging currency for cashier's checks, and thus met the section 103.11(3) definition of a financial institution required by law to file CTR forms in connection with the approximately $1.3 million in cash ex-

---

**17.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982) we adopted as precedent decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981.

**18.** 31 C.F.R. § 103.22(b)(2)(iii) reads:

[a bank may exempt from the reporting requirement] deposits, or withdrawals, exchanges of currency or other payments and transfers by local or state governments, or the United States or any of its agencies or instrumentalities.

changed for cashier's checks. In addition to the evidence of Lehrer's numerous conversations with Velasco concerning the exchange of U.S. dollars for Colombian pesos; his several references to having a number of clients with U.S. dollars to move; and his proposal to Velasco that he join him in setting up a large money laundering organization; there is the undisputed evidence that Lehrer provided the Ospinas a money laundering service whereby approximately $1.3 million was exchanged by Lehrer, through Velasco, over a four week period for a total commission of $52,000. That fact alone is sufficient to support the conclusion that Lehrer, in addition to being a travel agency owner, was also very much engaged in the business of dealing in currency. We note, moreover, this fact also belies appellant Ospina's assertion that he did not know Lehrer was engaged in the currency exchange business, as that was the only service he provided in exchange for his not inconsiderable commission.

Appellants' argument that the section 103.11(3) definition only includes persons whose "primary" business is dealing in currency and, therefore, does not apply to Lehrer, is meritless. The court in *United States v. Goldberg*, 756 F.2d 949, 956 (2d Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 2706, 86 L.Ed.2d 721 (1985) recently rejected this precise argument. After a detailed review of the applicable legislative history of the Reporting Act, the Second Circuit concluded that there was no "sound basis for imputing to Congress the intent to reach only persons whose 'primary' occupation was dealing in currency." *Id.* As the court explained:

> There is no indication that the word 'primarily' should be read as applying to the regulation's basic definition. If the Secretary had intended such a limitation, it would have been a simple matter to insert the word 'primary' before 'business,' thereby defining a financial institution as a person 'who engages as a *primary* business' in dealing in currency. The plain fact is that the regulation was not so written, and we see no support for the proposition that defendants are out-

side the reach of the Act because they may have engaged in the business of money laundering only as a sideline.

*Id.* (emphasis in original) We concur with the *Goldberg* court's reasoning and, thus, hold that Lehrer met the section 103.11(3) definition of a financial institution with a duty to file CTR's.

■ Second, as regards the government's alternative theory that appellants caused Flagship to fail to file CTR's, we find that appellants' argument that Flagship had no duty in this case misinterprets the application of the section 103.22(b)(1)(iii) exemption. Appellants are certainly correct that the evidence shows that Flagship relied on this exemption in not filing CTR's for the transactions in question. The evidence is clear that Flagship did not file CTR's because Velasco and Abalia identified themselves as government agents and, therefore, from Flagship's perspective they thought it was an exempt transaction. However, regardless of what Flagship may have thought, the transactions were not exempt because they were conducted by the agents on behalf of the appellants, not the government. The money did not belong to the government, nor did the government make these transactions in the normal course of government business, which we find is the type of transaction this exemption applies to. Contrary to appellants' assertion we do not believe that in so interpreting the exemption we are "rewriting the regulatory scheme." We are mindful we must interpret this exemption with " 'a common sense regard for regulatory purposes and plain meanings.' " *United States v. Fuentes-Coba*, 738 F.2d 1191, 1195 (11th Cir.1984) (citation omitted), *cert. denied*, — U.S. ——, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985). The language at subsection (c) of the exemption itself, which provides that "[i]n each instance the transactions exempted under paragraph (b) of this section must be ... in amounts which are *customary and commensurate with the authorized activities of the agency or instrumentality*" 31 C.F.R. § 103.22(c) (emphasis added), supports an interpreta-

tion that the exemption was meant to reach only the customary transactions of the government. We note, moreover, that when faced with a similar argument regarding the exemption, the court in *United States of America v. Richter*, 610 F.Supp. 480, 491 (N.D.Ill.1985), *aff'd sub nom. United States v. Mangovski*, 785 F.2d 312 (7th Cir.1986) reasoned:

> This exemption embraces, we believe, transactions *by* government *agencies* in their normal course of governmental business ... This is not a normal deposit by the government as part of its day-to-day operations. If we were to read the exemption as broadly as do the defendants, we would cripple most, if not all, government undercover operations in this area. The regulation was obviously not written with this intent. Instead it was presumably written to relieve the banks (and the IRS) of the heavy burden of filing forms for every routine governmental agency transaction of over $10,-000. Government agencies deal every day in large sums, and the act and the regulations were not written for the IRS to monitor this enormous daily flow of government money. *See* 31 U.S.C. § 5311 (Act intended to be used for criminal, tax or regulatory investigation). Our reading of the regulation is consistent with this fundamental intent of the Act.

Therefore, we find that Flagship did have a duty to file CTR's in the circumstances of this case. That the appellants unwittingly used an undercover agent to engage in the transactions does not change this fact. What is crucial is that if the appellants had personally conducted the transactions on their own behalf, Flagship would certainly have had a duty to report the transactions. That the agents did so on behalf of Lehrer and the Ospinas, and with the Ospinas' money, does not convert these transactions into transactions by the government as part of its day-to-day operations. Thus the factual circumstances of this case are controlled by our holding in *Tobon-Builes*, where we determined that defendants may be found guilty under section 1001 for

"willfully and knowingly caus[ing] financial institutions not to report currency transactions *that they had a duty to report and would have reported if they had known about such transactions.*" 706 F.2d at 1099 [emphasis added].

### B. *Knowledge and Intent*

As we observed in *United States v. Eisenstein*, 731 F.2d 1540, 1543 (11th Cir. 1984) (quoting *United States v. Granda*, 565 F.2d 922, 926 (5th Cir.1978) (citation omitted) (emphasis in original)):

> Only *willful* failures to file CTR's are subject to criminal penalties under the Act ... The law of this circuit is well established that, as it is used in the currency reporting statute, the term '*willful* require[s]' proof of the defendant's knowledge of the reporting requirement and his specific intent to commit the crime.

Appellants' assertion that there was insufficient evidence of their knowledge of the Reporting Act and their intent to violate it is, again, without merit.

■ There was direct evidence that both Lehrer and Mariano Ospina had knowledge of the reporting requirement. The evidence as to Lehrer showed that: he had several conversations with Velasco about the manner in which Velasco would violate the law by converting cash without filing the forms; they talked about recent arrests in Miami for conducting multiple transactions which made the climate "hot," and further that Velasco allegedly had a contact at a bank to obtain larger checks without reporting the transactions; and that Lehrer stated he did not care if the checks were large or small, as long as no forms were filed. Moreover, during one of their conversations, Lehrer and Velasco talked about the fact that Lehrer himself was acting as a financial institution. There was also testimony at trial that Lehrer discussed the filing of CTR forms with representatives at Barnett Bank on May 16, 1984. At that time, Lehrer expressed his displeasure in that the bank was going to "report[ ]" him if he cashed a check for

$10,000. As for Mariano Ospina's knowledge of CTR's, the office manager at Refco also testified at trial that he recalled that in a prior proceeding on September 7, 1984, he was asked if he had had a conversation about CTR's with Mariano, and that he responded as follows:

> Not really. I remember it like maybe six months ago that they—I told Mariano that any cash in excess of $10,000 that would be given to me would have to be reported at—would have to be reported by the bank because we deposit the money in the bank and the bank would have reported it on their name.

Lehrer's and Ospinas' words and actions in connection with the events of this case also belie any claim that their specific intent to violate the Reporting Act was not proven. From the first day that Lehrer talked to Agent Velasco about handling Ospina's money, the evidence establishes that the appellants desired to violate the currency reporting laws. The fact that Mariano and Rudolfo Ospina were willing to pay over $52,000 in cash as commissions for converting $1.3 million into cashiers checks itself refutes any claim of innocent conduct. The cash in many instances was wrapped in paper or packed in grocery bags. Mariano and/or Rudolfo Ospina transferred the cash in each instance to Velasco, a stranger to them, usually in the parking garage below Lehrer's office or in the elevator of that building, and during one such exchange, both Ospinas became afraid because they thought a car nearby to them in the garage was occupied by the police.

Moreover, the manner in which the Ospinas laundered the money out of the United States through their joint account at BAC International Bank, an offshore bank in the Cayman Islands, is also evidence from which the jury could infer guilty knowledge. They could have simply deposited their cash into a local bank and wire-transferred it to BAC International for a very small fee. Mariano Ospina in fact had an office at Refco, Inc. directly next door to BAC Credit Corporation which could have easily assisted his deposit activity. This would have generated a CTR by the depository bank. Instead, the Ospinas got together with Lehrer, paid $52,000 in commissions, transferred huge amounts of cash to a stranger in the parking garage of Lehrer's building, and then deposited most cashiers checks obtained by Lehrer into an account at Refco. Thereafter, the money was wired or transported by courier in the normal course of Refco's business, ultimately to a general account in New York City. Then, Rudolfo Ospina wire-transferred the money back via Miami to a secret and corporate account at BAC International Bank, Cayman Islands.

Certainly the jury could infer that the only purpose accomplished by this complicated scheme was for the Ospinas to disassociate themselves from the cash, and launder it out of the United States while avoiding any of the required CTR's. The disassociation was accomplished by using the services of Lehrer, who in turn used Velasco, to convert the cash without a CTR being filed. Thereafter, the evidence shows the money was laundered through Refco, where it appeared to be legitimate investment money, and ultimately to BAC, via a correspondent bank in Miami. A reasonable jury could certainly find the final result was consistent with the desire of the Ospinas, as expressed by Lehrer to the agents, to launder the money out of the United States, and thereafter, to exchange it for pesos in Colombia.

#### C. *Count Two*

Appellant Ospina also asserts that the evidence was insufficient to support his conviction for aiding and abetting on Count Two of the indictment because Agent Velasco did not meet him until June 20, 1984, the date of the second currency transaction. We disagree.

As we have previously observed, "[a] culpable aider and abetter need not perform the substantive offense, need not fully know of its details, and need not even be present." *United States v. Pepe*, 747 F.2d 632, 665 (11th Cir.1984) (footnotes

omitted). To sustain a conviction for aiding and abetting, the evidence "must show that the defendant associated himself with the crime, participated in it as something he wished to bring about, and sought by his actions to make it succeed." *Id.* While Ospina is correct that there is no direct evidence as to his participation in the June 12th transaction, we find there was nonetheless sufficient circumstantial evidence from which a reasonable jury could conclude he had aided and abetted that transaction.

The evidence before the jury included a similarity between the first and the later transactions. Lehrer instructed Velasco on June 12 to obtain checks in the name Hector Suarez. This is the same name that Velasco was told to use on checks obtained relative to other counts of the indictment. The checks obtained by Velasco later were deposited into Rudolfo Ospina's trading account at Refco, as were all the checks that went through Refco, and later such funds were wire-transferred from New York City out of Refco to the Ospinas' corporate account at BAC International. However, beyond a mere similarity in the transactions there was also evidence from which the jury could infer that the transactions were similar because all five were carried out at the behest of and to benefit both Mariano and Rudolfo. Mariano himself had opened the Ospinas' BAC corporate account and both he and Rudolfo obtained proceeds from the account that originated from funds obtained in all five transactions. Lehrer certainly indicated that all his negotiations with Velasco concerning the currency transactions and the commissions to be paid were done on behalf of both Ospinas. He referred to both of them as his clients and he told Velasco, albeit incorrectly, that both were owners of Refco and also that both were involved in the narcotics business and that their laundering activities were to facilitate this business. The jury could thus infer that the scheme to conceal was a joint venture between both Ospinas and involved monies jointly owned. Moreover, although it was Rudolfo who gave Velasco the $250,000 cash on June

12th, the evidence also established that prior to the exchange of cash, Lehrer left Velasco's presence to talk to the owner of the money and returned within five minutes. As Mariano had an office in the Refco suite which was upstairs in the same building, a reasonable jury could infer that Lehrer had gone upstairs and conferred with Mariano as well as Rudolfo.

In sum, as to this count we do not suggest that the circumstantial evidence against Mariano was overwhelming. It was not. But, taken in the light most favorable to the government, and drawing all reasonable inferences therefrom, we conclude the evidence was sufficient to support Mariano's conviction under an aiding and abetting theory.

### 2. The Conspiracy Count

 Appellants specifically argue that proof of the third object of the conspiracy relating to the facilitation of a narcotics business was insufficient. *See supra* p. 1576. We find, however, that the evidence was fully sufficient to show that the laundered money was proceeds from drug transactions. The evidence showed that the various quantities of currency obtained by Velasco from the appellants was dirty and gritty, leading to the reasonable conclusion by the jury that it had been in contact with cocaine under such conditions that cocaine residue adhered to it. Velasco testified that the money always was extremely dirty with a powdery substance on it. Each time he counted it with a machine, a little cloud of powder arose and he got headaches. He testified that he complained to Lehrer at one point about the headaches, to which Lehrer responded that he knew, and that the Ospinas were in that business, although he (Lehrer) only handled the money transactions. Contrary to the appellants' argument Lehrer's statement was correctly held by the district court to be in furtherance of the conspiracy and, therefore, admissible under Fed.R. Evid. 801(d)(2)(E). The statement is in the nature of an inducement by Lehrer to Velasco to further participate in the transac-

tions by identifying the source of the monies and clarifying the roles the co-conspirators would play in the agreement.

 Further, there was testimony by the narcotic detector dog handlers to the effect that Prince and Rebel reacted positively to the presence of narcotic residue on the currency which was the subject of Counts Three through Six. Prince and Rebel's handlers were qualified as experts and an appropriate jury instruction on expert witnesses was given by the court. Contrary to the argument of appellants, such dog reaction evidence was obviously relevant as having a tendency to make the existence of a fact, i.e., that the currency was tainted by narcotics, more probable than it would be without the evidence, under Fed.R.Evid. 401. This evidence need not be "conclusive of a material issue in order to be admitted." *United States v. Madera,* 574 F.2d 1320, 1322 (5th Cir.1978). We find this evidence assisted the jury's conclusion that the laundered money was drug proceeds. Appellants have failed to show an abuse of the district court's discretion in admitting this evidence. *Id.* Any defects in the quality of the dog alert evidence goes to its weight, rather than its admissibility. Finally, there was the evidence of the money itself. The amount of money coupled with the short period of time it was transferred in could lead to a reasonable conclusion by the jury that it was the proceeds of a narcotics business.

## IV.

In conclusion for the foregoing reasons, the decision of the district court is AFFIRMED.