**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John S. RIGDON, Defendant–Appellant.**

**No. 88–3625.**

United States Court of Appeals, Eleventh Circuit.

June 6, 1989.

Barbara Sanders, Apalachicola, Fla., for defendant-appellant.

David L. McGee, Asst. U.S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before JOHNSON and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

JOHNSON, Circuit Judge:

This case arises on appeal from a jury verdict finding John Rigdon guilty of two counts of failure to file federal cash transaction reports under 31 U.S.C.A. § 5313 and two counts of intentionally concealing material facts from the I.R.S. under 18 U.S.C.A. § 1001. We affirm in part and reverse in part.

## I. FACTS

In 1987, Rigdon was involved in the nascent operations of an off-shore bank[1] in Barbados. Sometime in 1987, Jim Wiles approached Rigdon for help in laundering money for "some people in South Florida." Wiles was subsequently arrested in an unrelated money-laundering transaction. Wiles turned government informant. Shortly thereafter, Wiles received a call from Rigdon who indicated that the Barbados bank might prove useful in helping Wiles launder money. Wiles alerted government agent Warren. Warren then posed as a narcotics trafficker in need of Rigdon's services.[2]

Over the following weeks Rigdon and Warren met on several occasions to discuss ways to launder money. They finally agreed that Rigdon would receive cash from Warren and prepare false documents indicating that the money had been acquired as the result of a loan. Rigdon would then present Warren a cashier's check for the money minus his fee (10% for small amounts; 5% for large amounts). Warren gave Rigdon money on two occa-

---

1. An off-shore bank is one that does not accept deposits in the United States and therefore is exempt from federal currency reporting requirements.

2. It was disputed at trial whether Rigdon knew Warren was supposedly involved in dealing drugs. It was undisputed that Rigdon knew Warren's money had been obtained illegally in some manner.

sions. On July 7, 1987, Rigdon received $25,000. In exchange, on July 21, 1987, he gave Warren false loan documents and a cashier's check for $22,500 ($25,000 minus his 10% fee). The check bounced.[3] On July 29, Rigdon received $38,500 more. He spent the $38,500, and Warren never received another cashier's check.

The jury found Rigdon guilty on two counts (I and III) of failure to file cash transaction reports (CTRs) as required by 31 U.S.C.A. § 5313 and 31 C.F.R. § 103 *et seq.* (1987), and two counts (II and IV) of concealing by trick or artifice the cash transactions in violation of 18 U.S.C.A. § 1001. Rigdon received a 42–month sentence on each count to be served concurrently and was ordered to pay a total of $63,500 in restitution.

## II. DISCUSSION

### A. Failure to File CTRs

Section 5313(a) provides that when "a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of [currency, it] shall file a report on the transaction at the time and in the way the secretary prescribed." *See* 31 C.F.R. §§ 103.22(a), 103.26 (1987) (specifying $10,000 as trigger amount and filing procedures). A financial institution is defined, *inter alia*, as "[a] person who engages as a business in dealing in or exchanging currency." 31 C.F.R. §§ 103.11(e), (g)(3) (1987). Rigdon argues that he was not required to file CTRs in connection with his acceptance of money from agent Warren because he was not a financial institution.

#### 1. *Rigdon as Financial Institution*

■ Rigdon's first argument—that he was not a financial institution for purposes of 31 U.S.C.A. § 5313 and 31 C.F.R. § 103.11(g)(3) (1987)—is foreclosed by *United States v. Hernando Ospina*, 798 F.2d 1570 (11th Cir.1986) (per curiam). In *Hernando Ospina*, the defendant, a travel agent, accepted large amounts of "dirty" money on five occasions. Each time he exchanged the money for a cashier's check, minus a two-percent fee. In considering whether the individual defendant was a "financial institution" for the purposes of 31 C.F.R. § 103.11, this Court held that "[defendant] was engaged in the 'business' of exchanging currency for cashier's checks, and thus met the section 103.11(3) definition of a financial institution required by law to file CTR forms." *Id.* at 1578. Rigdon's identical activity—exchanging currency for cashier's checks for a fee— therefore qualifies him as a financial institution that must report all transactions involving $10,000 or more in currency.

■ Rigdon attempts to distinguish *Hernando Ospina* on the basis of the scope of his activities. The defendant in *Hernando Ospina* conducted five transactions involving $1.3 million. Rigdon conducted two transactions (only one of which resulted in the actual exchange of a cashier's check) involving $63,500. A small number or size of transactions is not a valid defense. The requirement in 31 C.F.R. § 103.11(g)(3) (1987) that a party "engag[e] as a business in dealing in or exchanging currency" protects only the unsuspecting citizen who might on one occasion buy a cashier's check for a friend or relative. The evidence before the court showed that Agent Warren was the fourth in what Rigdon intended to be a string of fee-paying money-laundering customers.[4]

■ Rigdon also notes that the cashier's check for $22,500 written to Warren was drawn on one of Rigdon's corporate accounts, an account which never received a deposit of any dirty money. The law does not require that the cashier's check actually be bought with the dirty money, however. He exchanged $25,000 in currency for a $22,500 cashier's check. That is enough to trigger the reporting requirement. *See Hernando Ospina*, 798 F.2d at 1578–80. If Rigdon's argument were

---

**3.** Rigdon spent the $25,000 and drew on an insufficiently-funded account owned by his mortgage finance business to write Warren the $22,500 cashier's check.

**4.** Agent Warren testified that Rigdon "indicated that I was the fourth client of this type that he had. And he hoped to have seven or eight." Record Transcript Vol. 3, p. 69.

tenable, money launderers could drive a truck through the hole rent in the statute.

### 2. *Specific Intent*

▮ Rigdon's failure to file a CTR is a crime if he had specific knowledge of the statute and its implementing regulations. *See Hernando Ospina,* 798 F.2d at 1580–81; (quoting *United States v. Eisenstein,* 731 F.2d 1540, 1543 (11th Cir.1984)). Ignorance of the reporting requirement constitutes a valid defense. *Id.; see generally Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). At trial, Rigdon admitted knowing that a bank must file a CTR upon receiving at least $10,000 in currency; however, he denied knowing that he was a financial institution with a duty to report as defined by 31 C.F.R. § 103.11(g)(3) (1987). He claims the evidence allows only the inference that he had a vague notion about CTRs. The trial testimony of Agent Warren belies Rigdon's claim of ignorance.[5] The government proved that Rigdon had quite a detailed knowledge of CTR reporting requirements and how to avoid them. In addition, the jury could have inferred knowledge on Rigdon's part from the manipulative and shadowy nature of his structuring of the transactions. *See Hernando Ospina,* 798 F.2d at 1581 ("the manner in which Ospina laundered the money out of the United States ... is also evidence from which the jury could infer guilty knowledge"). Viewed in a light most favorable to the government, *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence was sufficient to prove Rigdon's knowledge and intent.

### 3. *Entrapment*

▮ Rigdon claims he was entrapped by Wiles (the government informant) and War-

ren (the agent posing as a narcotics trafficker). He argues that he was not predisposed to commit the crime. *See United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (predisposition of the defendant defeats defense of entrapment). Rigdon vaguely suggests that Wiles pressured him. However, the evidence is undisputed that Wiles contacted Rigdon *before* Wiles turned informant. Rigdon then contacted Wiles about laundering money *without further prompting* from Wiles. The evidence showed that Rigdon knew the money was dirty. The record contains testimony from which the jury could have concluded that Agent Warren was Rigdon's fourth money-laundering customer. *See* note 4, *supra.* The jury reasonably could have found that Rigdon was predisposed to commit the crime.

## B. Jury Instructions

Rigdon did not object to the jury instructions at trial. Therefore, this Court will reverse only for plain error. *See* Rule 52(a); *United States v. Parikh,* 858 F.2d 688, 694 (11th Cir.1988) ("[The plain error] doctrine authorizes this court to correct only particularly egregious errors which seriously affect the fairness, integrity, or public reputation of the proceedings.").

### 1. *Aiding and Abetting*

▮ The district court instructed the jury on Counts I and III on aiding and abetting the failure to file CTRs. *See* 18 U.S.C.A. § 2. In order to aid or abet, Rigdon would have had to have helped cause another financial institution to fail to file a CTR. *See United States v. Martin,* 747 F.2d 1404, 1407 (11th Cir.1984) ("One cannot aid or abet himself."). Rigdon argues

---

5. Agent Warren testified that Rigdon understood CTR requirements. Warren testified that he and Rigdon discussed CTRs on numerous occasions. He testified that Rigdon spoke knowledgeably of how to use off-shore banks to evade federal reporting requirements. He testified that they discussed Warren's problems of how to transform his cash into a usable form without the government's knowledge. Rigdon consistently assured Warren that no CTR would be filed. Warren described how Rigdon out-

lined the complex procedure by which he intended to get money to Barbados and back to the United States through his mortgage finance company through issuance of false loan documents. Rigdon told Warren that such financial operations were "his line of work." Warren testified that Rigdon even knew some of the numbers found on CTR forms. *See* Record Transcript Vol. 3, pp. 54, 66–67, 74–76, 79–80, 83.

the evidence failed to show that he caused *another* financial institution to fail to file a CTR. Under the government's primary theory of the case, Rigdon himself was the financial institution. Rigdon argues the instruction permitted the jury to find him guilty of causing the Barbadoan bank he represented to fail to file a CTR—a crime which, according to Rigdon, is unsupported by the evidence.[6] However, the jury could have found from the evidence that Rigdon acted as an agent of the bank. The jury could have found that Rigdon acted like a teller accepting deposits on the bank's behalf and thereby imposing on his bank a duty to file a CTR upon his receipt of the money.[7] A teller with the requisite intent can be liable as an aider and abetter for causing the bank to fail to file a CTR. *See United States v. Cure*, 804 F.2d 625, 629 (11th Cir.1986) (per curiam) ("a person with no duty to file CTRs can be prosecuted ... on account of aiding and abetting a financial institution's failure to file CTRs"). The financial institution need not have knowledge of the wrongdoing. *Id.* at 629–30. The district court's instruction that Rigdon could be found guilty if he caused a financial institution to fail to file a CTR does not constitute plain error.

### 2. *Materiality*

■ In Counts II and IV, Rigdon was convicted of violating 18 U.S.C.A. § 1001 (concealing a material fact from a government agency). Materiality is an element of the offense. *See United States v. Gafyczk*, 847 F.2d 685, 690 (11th Cir.1988). The trial court instructed the jury that the facts alleged were material as a matter of law. Rigdon claims this instruction violated his right to jury trial. Given that numerous cases from this Court have held that materiality is a question of law, *see,*

*e.g., United States v. White*, 765 F.2d 1469, 1473 (11th Cir.1985); *United States v. Krause*, 507 F.2d 113, 118 (5th Cir.1975), and not a question of fact for the jury, it can hardly be said that the court committed plain error.

### C. Count IV

■ Count IV charged Rigdon with concealing or covering up by "trick, scheme, or device" his failure to file a CTR after the July 29, 1987, transaction with Agent Warren. Rigdon admits he employed a "trick, scheme, or device" to conceal the July 7, 1987, transaction. In that transaction, his use of false loan documents satisfied the requirement of § 1001 "that the material fact was *affirmatively concealed* by ruse or artifice, by scheme or device." *United States v. London*, 550 F.2d 206, 214 (5th Cir.1977) (emphasis added). However, the transaction alleged in Count IV involved no affirmative acts of concealment as required by *London. See id.* ("mere omission ... does not make out an offense under the conceal or cover up clause of § 1001"). Rigdon simply took Agent Warren's cash and spent it. He took no affirmative steps to conceal the transaction. The government argues that Rigdon flew from Orlando to Tallahassee to Orlando to pick up the money. Although this flight may have been an affirmative act, it was not an affirmative act to conceal the transaction. Nor does it appear to have been intended to conceal the transaction. Rigdon's motion for entry of judgment of acquittal on Count IV for failure to prove a "trick, scheme, or device" should have been granted.[8]

### D. Venue

■ Rigdon claims venue is proper under 31 U.S.C.A. § 5313 only in Washington,

---

**6.** It was undisputed at trial that Rigdon spent the money himself.

**7.** Rigdon's argument that the off-shore bank he represented was not subject to federal reporting requirements is unavailing. The reporting requirements do not apply when such banks do not accept deposits in the United States. The jury could have found that the bank, through Rigdon, was accepting deposits in the United States.

**8.** Rigdon's sentence on Count IV was to run concurrently with the sentences imposed on the other three counts. Because the parties have failed to discuss the application of the concurrent sentence doctrine, we decline to address the issue. *See United States v. Brewer*, 807 F.2d 895, 896 n. 1 (11th Cir.), *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1909, 95 L.Ed.2d 515 (1987) (declining to apply doctrine when unraised by parties).

D.C., where CTRs can be filed.[9] *Compare Johnston v. United States*, 351 U.S. 215, 220, 76 S.Ct. 739, 742, 100 L.Ed. 1097 (1956) ("where the crime charged is a failure to do a legally required act, the place fixed for its performance fixes the situs of the crime") *with* 18 U.S.C.A. § 3237(a) (crimes committed in more than one district may be prosecuted "in any district in which such offense was begun, continued or completed"). Rigdon's claim is frivolous. First, it is undisputed that the alleged crime was begun in the Northern District of Florida. In fact, almost all affirmative acts occurred in the Northern District of Florida. *See United States v. Greene*, 862 F.2d 1512, 1515–16 (11th Cir.1989) (in case where defendant had false document presented to New York bank, venue was proper in Northern District of Florida where defendant prepared the false document). Second, Rigdon could have mailed the CTRs to Washington, D.C., from the Northern District. In fact, he may have been able to file the required CTRs with the IRS in the Northern District of Florida.[10] We conclude, then, that Rigdon's "failure to file" occurred in the Northern District. *Cf. Johnston*, 351 U.S. at 220, 76 S.Ct. at 742 (where conscientious objectors had to report physically to hospitals, venue lay only where hospitals were located). Venue was properly laid in the Northern District of Florida.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the jury's verdict on Counts I–III, but REVERSE as to Count IV.

**9.** This argument fails in the context of an 18 U.S.C.A. § 1001 case. *See Hernando Ospina*, 798 F.2d at 1577.

**10.** The regulations in effect at the time did not specify a specific place for filing. *See* 31 C.R.F. § 103.26(a)(4) (all reports must "be filed with the Commissioner of Internal Revenue, unless otherwise specified").